Thomas D. Haklar, CA Bar No. 169039
Peggy J. Reali (Of Counsel) SBN 153102
**LAW OFFICE OF THOMAS D. HAKLAR**
320 Encinitas Blvd., Suite A
Encinitas, CA 92024
Tel.: (858) 481-5454
Fax: (858) 720-9797
thaklar@haklarlaw.com

Scott D. Hirsch (*Pro Hac Vice to be filed*)
**SCOTT HIRSCH LAW GROUP, PLLC**
7301 W Palmetto Park Rd #207A
Boca Raton, FL 33433
Tel.: (561) 569-7062
scott@scotthirschlawgroup.com

Attorneys for Plaintiff and Others Similarly Situated
*[Additional Attorneys on next page]*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUSAN SMITH, individually and on behalf of all others similarly situated,<br><br>            Plaintiff,<br><br>    vs.<br><br>WALGREENS BOOTS ALLIANCE, INC., WAGDCO, LLC, COSTCO WHOLESALE CORPORATION and DOES 1-10,<br><br>            Defendants | Case No.: 20-cv-05451-JD<br><br>**FIRST AMENDED COMPLAINT**<br>**CLASS ACTION FOR**<br>(1) **Violations Title III of the Americans with Disabilities Act 42 U.S.C. §12182(a);**<br>(2) **Violations Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794;**<br>(3) **Violation Section 1557 of the Patient Protection and Affordable Care Act,42 U.S.C. § 18116;**<br>(4) **Violation of Unruh Civil Rights Act, Cal. Civ. Code § 51, *et seq.*, and**<br>(5) **Violation of California Unfair Competition Law, Cal. Bus. & Pro. Code §17200, *et seq.*;**<br><br>**DEMAND FOR JURY TRIAL** |

Robert Redfearn (*Pro Hac Vice to be filed*)

00899636-1

Robert L. Redfearn, Jr. (*Pro Hac Vice to be filed*)
**SIMON, PERAGINE, SMITH & REDFEARN, LLP**
30th Floor, Energy Center
1100 Poydras Street
New Orleans, La.  70163-3000
Tel:  (504) 569-2030
Fax: (504) 569-2999
Robertr@spsr-law.com
Robertjr@spsr-law.com

Mark Kepple (*Pro Hac Vice to be filed*)
**BAILEY & WYANT, PLLC**
1219 Chapline St.
Wheeling, W. Va.  26003
Tel.: (304) 233-3100
Fax: (304) 343-3133
mkepple@baileywyant.com

Joseph A. Bruno (*Pro Hac Vice*)
**BRUNO & BRUNO**
855 Baronne St
New Orleans, Louisiana 70113
Tel.: (504) 525-1335
Fax: (504) 581-1493
jbruno@brunobrunolaw.com

Ted Huge (*Pro Hac Vice to be filed*)
**HARRIS & HUGE, LLC**
180 Spring St.
Charleston, SC 29403
Tel.: (843) 805-8031
Fax: (843) 636-3375
Ted@harrisandhuge.com

*Attorneys for Plaintiff*

## CLASS ACTION COMPLAINT

Plaintiff Susan Smith, by and through her undersigned counsel, brings this class action lawsuit for violations of the Americans with Disabilities Act, 42 U.S.C. §12101, et seq., the Rehabilitation Act of 1973, 29 U.S.C. §701, et seq., the Affordable Care Act, 42 U.S.C. §18116, *et seq*., the Unruh Civil Rights Act, Cal. Civ. Code §51, *et seq*. and the California Unfair Competition Law, Cal. Bus. & Pro. Code §17200 *et seq*. In support, Plaintiff alleges the following:

### I.

### NATURE OF THE ACTION

1.      This is a putative class action brought pursuant to Fed. R. Civ. P. 23. It is brought by an individual on her own behalf and on behalf of all others similarly situated, against one of the country's largest pharmacy chains owned, operated and/or controlled by Walgreens Boots Alliance, Inc. and/or WAGDCO, LLC and also against Costco Wholesale Corporation (jointly referred to as "Defendants").

2.      This class action seeks to recover from Defendants damages and injunctive relief for their corporate wide discriminatory practices in refusing to fill, without a legitimate basis, valid and legal prescriptions for opioid medication of Plaintiff and the Members of the National Class and the California Subclass, protected individuals under federal law.

### II.

### THE PARTIES

3.      Plaintiff Susan Smith is an individual residing in Castro Valley, California. Mrs. Smith suffers from severe trauma induced epilepsy and migraines resulting in her suffering chronic pain.

4.      Defendant Walgreens Boots Alliance, Inc. ("Walgreens") is a Delaware corporation with its principal place of business in Illinois and is the successor by merger to Walgreens Co. Walgreens, through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor and operates retail stores, principally Walgreens, Rite Aid and Duane Reade

pharmacy brands, throughout the United States in all 50 states that sell prescription medicines, including opioids.

5.      Defendant WAGDCO, LLC is a Delaware limited liability company with its principal place of business at 104 Wilmont Road, Deerfield, Illinois 60015. WAGDCO, LLC is a wholly owned subsidiary of Defendant Walgreens Boots Alliance, Inc. WAGDCO, LLC provides services to Plaintiff and members of the Class through the Walgreens Prescription Savings Cub. The Walgreens Prescription Savings Club is represented to offer discounts on prescription drug prices in exchange for an annual fee.

6.      Defendant Costco Wholesale Corporation ("Costco") is a Washington corporation with its principal place of business at 999 Lake Dr., Issaquah, WA 98027-8990 doing business in California. Its agent for service of process is CT Corporation System, 818 W. Seventh Street, Suite 930, Los Angeles, Ca. 90017.

7.      The Walgreens Defendants are jointly referred to as "Walgreens" and the Walgreens Defendants and Costco are jointly referred to as "Defendants."

8.      Plaintiff is currently unaware of the true names and capacities of the defendants sued in this action by the fictitious names DOES 1 through 10, inclusive, and therefore sues those defendants by those fictitious names. Plaintiff will amend this complaint to allege the true names and capacities of such fictitiously named defendants when they are ascertained.

## III.

## JURISDICTION AND VENUE

9.      This Court maintains jurisdiction over the parties to this action. Plaintiff is a citizen of the State of California. Additionally, the members of the Class are resident citizens of California as well as other states where Defendants conduct business. The Walgreens Defendants are citizens of

the State of Illinois and are authorized and are doing business in the State of California.  Costco is a citizen of the State of Washington doing business in the State of California.

10.     This Court has subject matter jurisdiction over this action.  Federal question jurisdiction exists based on the assertion of claims for violations of the Americans with Disabilities Act, 42 U.S.C. §12101, et seq., the Rehabilitation Act of 1973, 29 U.S.C. §701, et seq., and the Affordable Care Act, 42 U.S.C. §18116, *et seq*.

11.     This Court also has jurisdiction over this matter pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1332(d). CAFA's requirements are satisfied in that (1) the members of the Class exceed 100; (2) the citizenship of at least one proposed Class member is different from that of the Defendants; and (3) the matter in controversy, after aggregating the claims of the proposed the Members of the National Class and the California Subclass, exceeds $5,000,000.00, exclusive of interest and costs.

12.     This Court has general diversity jurisdiction pursuant to 28 U.S.C. §1332(a)(1) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity between the named Plaintiff and the Defendants.

13.     Additionally, this Court has jurisdiction pursuant to 28 U.S.C. §1343(a)(4) in that this action seeks to recover damages or to secure equitable relief under an Act of Congress providing for the protection of the Plaintiff's and the Class Members' civil rights.

14.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the Plaintiff's and California Subclass Members' pendent claims under the California Unruh Civil Rights Act (California Civil Code §§ 51, *et seq*.), and California Unfair Competition Law (Cal. Bus. & Pro. Code §17200, *et seq*.).

15.     Venue is proper in this District under 28 U.S.C. §1391.

# IV.

## CLASS ACTION ALLEGATIONS

16.    Plaintiff brings this action on behalf of herself and all others similarly situated, pursuant to Rule 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, and is a member of, and seeks to represent, a National Class of persons defined as:

> All persons residing in the United States during the period of January 1, 2013 to present, who were issued prescriptions for opioid medication by a licensed medical provider as part of medical treatment for (i) chronic pain, defined as pain lasting 3 or more months, from any cause, (ii) pain associated with a cancer diagnosis or treatment, (iii) palliative or nursing home care or (iv) sickle cell anemia and were either (a) unable to get any such prescription(s) filled, (b) unable to get any such prescription(s) filled as written, (c) required to submit non-opioid prescriptions or purchase other products in conjunction with their opioid prescription(s) or (d) told that their prescriptions for opioid medication would no longer be filled or no longer be filled as written at any pharmacy owned, controlled and/or operated by the Defendants in the United States (collectively referred to as the "National Class").

Excluded from the Class are:

a.    The officers and directors of any of Defendants and their immediate family;

b.    Any judge or judicial personnel assigned to this case and their immediate family;

c.    Any legal representative, successor or assignee of any excluded person or entity.

17.    Plaintiff also seeks certification of the following California-wide Subclass (the "California Subclass") pursuant to Rule 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure :

> All persons residing in the state of California any time during the period of January 1, 2013 to present, who were issued prescriptions for opioid medication by a licensed medical provider as part of medical treatment for (i) chronic pain, defined as pain lasting 3 or more months, from any cause, (ii) pain associated with a cancer diagnosis or treatment, (iii) palliative or nursing home care or (iv) sickle cell anemia and were either (a) unable to get any such prescription(s) filled, (b) unable to get any such prescription(s) filled as written, (c) required to submit non-opioid prescriptions or purchase other products in conjunction with their opioid prescription(s) or (d) told that their prescriptions for opioid medication would no longer be filled or no longer be filled as written at any pharmacy owned, controlled and/or operated by the Defendants in the United States (collectively referred to as the "California Subclass").

Excluded from the Class are:

a.  The officers and directors of any of Defendants and their immediate family;

b.  Any judge or judicial personnel assigned to this case and their immediate family;

c.  Any legal representative, successor or assignee of any excluded person or entity.

**Numerosity of the Class (Fed. R. Civ. P. 23(a)(1))**

18.    The members of the National Class and the California Subclass are so numerous that joinder of all members is impracticable.  Plaintiff estimates the number of  Members of both the National Class and the California Subclass to be in the tens of thousands or more similarly situated individuals nationwide.

19.    The Members of the National Class and the California Subclass are identifiable using methods of assessment and/or records maintained in the ordinary course of business by the Defendants or by other suitable methods.

20.    Notice may be provided to the Members of the National Class and the California Subclass by publication, and/or other means.

**Commonality (Fed. R. Civ. P. 23(a)(2))**

21.    Common questions of law and fact exist as to all Members of the National Class and the California Subclass and predominate over questions affecting individual Class Members of both Classes.  Among the questions of law and fact common to both Classes are:

a.  Whether Defendants improperly refused to fill the legitimate prescriptions of the Members of the National Class and the California Subclass for opioid medication;

b.  Whether Defendants implemented express and/or implicit state-wide and/or national policies regarding the filling of opioid prescriptions which misinterpret and/or misapply applicable guidelines and laws;

c.  Whether Defendants implemented or created state-wide and/or national databases and/or used data analytical tools as part of determining whether to fill the opioid prescriptions of the Members of the National Class and the California Subclass;

d.  Whether Defendants "profiled" persons presenting prescriptions for opioid pain medication on a state-wide and/or national basis;

e.  Whether Defendants' express and/or implicit policies regarding the filling of prescriptions for opioid medication interfere with the relationship of the Members of the National Class and the California Subclass with their physicians;

f.  Whether Defendants' express and/or implicit policies regarding the filling of prescriptions for opioid medication impose unnecessary requirements that increase the cost and expense to the Members of the National Class and the California Subclass;

g.  Whether Defendants' express and/or implicit policies, resulting in the refusal to fill the opioid prescriptions of the Members of the National Class and the California Subclass violate the ADA and/or Section 504 of the Rehabilitation Act; and

h.  Whether Defendants' express and/or implicit policies, resulting in the refusal to fill the opioid prescriptions of the Members of the National Class and the California Subclass violate the Anti-Discrimination provisions of the ACA.

22.     Among the questions of law and fact common to the California Subclass are:

a.  Whether Defendants' express and/or implicit policies, resulting in the refusal to fill the opioid prescriptions of the Members of the California Subclass violate the California Unruh Civil Rights Act, Ca. Civil Code §51, et seq.

b.  Whether Defendants' express and/or implicit policies, resulting in the refusal to fill the opioid prescriptions of the Members of the California Subclass violate the California Unfair Competition Law, Ca. Bus. & Pro. Code §17200, et seq.

23.     Defendants are expected to raise common defenses to these claims, including denying that their actions violated the law.

**Typicality (Fed. R. Civ. P. 23(a)(3))**

24.     The claims of the representative Plaintiff are typical of the claims of both the putative National Class and the California Subclass.  Furthermore, the factual bases of Defendants' misconduct are common to all Members of the National Class and the California Subclass and represent a common thread of misconduct resulting in injury to all members of both Classes.  Plaintiff has been damaged by the same wrongful conduct by Defendants and suffered injuries similar in kind and degree to the injuries suffered by the putative Class members of both Classes.  Plaintiff makes the same claims and seeks the same relief for herself and for all Class Members, including relief available to California residents under California law.

**Adequacy of Representation (Fed. R. Civ. P. 23(a)(4))**

25.    Plaintiff will fairly and adequately represent and protect the interests of both Classes. Plaintiff has retained counsel with substantial experience in prosecuting complex class actions. Neither Plaintiff nor her Counsel have interests adverse to those of either Class.

**Superiority of Class Action (Fed. R. Civ. P. 23(b)(2))**

26.    Absent class treatment, Plaintiff and the Members of the National Class and the California Subclass will continue to suffer harm as a result of Defendants' unlawful and wrongful conduct. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Without a class action, individual Class Members would face burdensome litigation expenses, deterring them from bringing suit or adequately protecting their rights. Because of the ratio of the economic value of the individual Class Members' claims in comparison to the high litigation costs in complex cases such as this, few could likely seek their rightful legal recourse. Absent a class action, the Members of the National Class and the California Subclass will continue to incur harm without remedy.

27.    Nationwide class and Subclass certification of the claims is appropriate pursuant to Fed. R. Civ P. 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the National Class and the California Subclass, making appropriate both declaratory and injunctive relief with respect to Plaintiff and the National Class and the California Subclass as a whole.

**Superiority of Class Action (Fed. R. Civ. P. 23(b)(3))**

28.    Proceeding on a class wide basis for both the Nationwide Class and the California Subclass is a superior method for the fair and efficient adjudication of the controversy because class treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort, judicial resources, and expenses that individual actions would entail. Class treatment will allow the

Members of the National Class and the California Subclass to seek redress for injuries that would not be practical to pursue individually because the damages suffered by the individual Members of the putative class is relatively small compared to the burden and expense of individual litigation of their claims against the Defendants.  These benefits substantially outweigh any difficulties that could arise out of class treatment.

29.     Moreover, prosecuting separate actions by individual Class Members would create a risk of:

(A) inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for the Defendants; and/or

(B) adjudications with respect to individual Class Members that, as a practical matter, would be dispositive of the interests of the other Members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

30.     Plaintiff knows of no difficulty that will arise in the management of this litigation that would preclude its maintenance as a class action.

31.     Additionally, certification of the California Subclass is appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to class Members predominate over questions affecting only individual class Members.

32.     Finally, Defendants have acted or refused to act, on grounds that apply generally to both Classes, so that final injunctive relief or corresponding declaratory relief is appropriate respecting each Class as a whole.

## V.

## **GENERAL BACKGROUND**

33.     Over the past few years, it has been well publicized that there is a national problem with opioid abuse alleged to result from the aggressive and misleading marketing of opioid medication

00899636-1

by various pharmaceutical companies manufacturing such medication. To combat this problem, steps have been taken to limit production of and access to opioid medication.

34.     What has not been as widely publicized is the effect these steps have had on innocent and legitimate users of opioid medication suffering from chronic pain or pain associated with a cancer diagnosis, palliative or nursing home care or sickle cell anemia. These innocent and legitimate users have been denied access to necessary medication, arbitrarily treated as criminals and/or drug addicts and forced to incur unnecessary additional expenses to obtain opioid medication prescribed for legitimate medical needs as determined by their treating medical providers, all while suffering from debilitating pain.

35.     Chronic pain, typically defined as pain lasting three months or more, is one of the most common health problems in the United States. An estimated 40 million adults in the United States have high levels of pain every day, and these individuals report worse health, use the health care system more frequently, and are more likely to receive disability benefits.[1]

36.     In 2016, the Global Burden of Disease Study estimated that low back pain and migraines were among the five leading causes of ill-health and disability - and the leading causes in high-income, high-middle-income, and middle-income countries.[2]

37.     According to the Centers for Disease Control ("CDC"), in 2016 alone, an estimated 50 million Americans suffered from chronic pain with about 20 million Americans experiencing high impact chronic pain, defined as chronic pain that limited life or work activities on most days for the

---

[1] Richard L. Nahin, "Estimates of Pain Prevalence and Severity in Adults: United States, 2012," The Journal of Pain, 2015 Aug; 16(8): 769-780, doi: 10.1016/j.jpain.2015.05.002.
[2] GBD 2016 Disease and Injury Incidence and Prevalence Collaborators, "Global, Regional, and National Incidence, Prevalence, and Years Lived With Disability for 328 Diseases and Injuries for 195 Countries, 1990-2016: A systematic Analysis for the Global Burden of Disease Study 2016," The Lancet, September 16, 2017, doi: 10.1016/S0140-6736(17)32154-2.

00899636-1

prior six (6) months.[3]  Of the 20 million experiencing high impact chronic pain, 78% (more than 15 million) were age 45 years and older.

38.    Chronic pain has serious ramifications, not just physically but also psychologically. Depression and anxiety disorders are much more prevalent in individuals experiencing chronic pain than in those who do not.[4]  A number of studies have demonstrated that chronic pain patients have an increased risk of suicide, even when controlling for other factors such as socioeconomic status, general health, and psychological disorders.[5]  Chronic pain patients also often experience a sense of hopelessness and catastrophic thoughts from the fear that their pain may never go away.[6]

39.    There is a well-studied correlation between chronic pain and suicidal behavior. Involuntarily tapering or deprivation of a patient of opioid medication, particularly those who have been on high-dose opioids for long periods, has major physical and mental health repercussions and has been shown to increase the risk of suicidal behavior.  One study found that 9.2% of involuntarily tapered patients reported suicidal thoughts to their healthcare provider while 2.4% attempted suicide.[7]  The study's authors believe that these incidents were underreported.

40.    Chronic pain can result from a wide range of causes, such as traumatic injury, medical treatment, inflammation, or neuropathic pain.[8]  Patients with the same diagnosis can have different

[3] Dahlhamer, J., J., Lucas, C., Zelaya, et al. 2019. Prevalence of Chronic Pain and High-Impact Chronic Pain Among Adults - United States, 2016. *MMWR*, 67, no. 36:1001–1006. Retrieved from https://www.cdc.gov/mmwr/volumes/67/wr/mm6736a2.htm.

[4] Oye Gureje, et al., "Persistent Pain and Well-Being: A World Health Organization Study in Primary Care," JAMA, 1998; 280(2): 147-151, doi: 10.1001/jama.280.2.147.

[5] Alfton Hassett, Jordan Aquino, and Mark Ilgen, "The Risk of Suicide Mortality in Chronic Pain Patients," Current Pain and Headache Reports (2014) 18:436, doi: 10.1007/511916-014-0436-1.

[6] Nicole Yang and Catherine Krane, "Suicidality in Chronic Pain: A Review of the Prevalence, Risk Factors, and Psychological Links," Psychological Medicine, May 2006, doi: 10.1017/50033291705006859.

[7] Demidenko MI, et al., Suicidal ideation and suicidal self-directed violence following clinician-initiated prescription opioid discontinuation among long-term opioid users, Gen Hosp Psychiatry. 2017 Jul;47:29-35. doi: 10.1016/j.genhosppsych.2017.04.011. Epub 2017 Apr 27, p. 29.

[8] Institute of Medicine of the National Academies, Relieving Pain in America: A Blueprint for Transforming Prevention, Care, Education, and Research (Washington: IOM, 2011), p. 35.

pain levels.   Because chronic pain has such diverse causes and wide-ranging effects, it poses challenges to treatment.[9]

41.     Patients react (and fail to respond) to a wide range of interventions for their pain.[10]  The 2011 Institute of Medicine (IOM) report "Relieving Pain in America" suggests that it is for these reasons that a simplistic medical approach, in which doctors diagnose and "cure" patients, might not be the norm for patients suffering chronic pain.   It cautions that the "road to finding the right combination of treatments ... may be a long one."[11]

42.     Chronic pain was often undertreated before the 1990s.[12]  During that decade, patient advocates, pain specialists, and medical organizations increasingly drew attention to the suffering of chronic pain patients and began calling on practitioners to take greater steps to alleviate patient suffering, including by prescribing opioid analgesics.[13]

43.     Toward the mid-2000s, public health officials began noticing an uptick in overdose deaths involving opioids, which set off a major debate about the appropriateness of prescribing these medications for both acute and chronic pain.

44.     As a result, government agencies sought to limit the supply and use of prescription opioids in the U.S., encourage more conservative prescribing practices, strengthen oversight over the use of these medicines, and crack down on fraudulent prescribing and marketing practices.

---

[9] Ibid., p. 116
[10] Courtney Lee, et al., "Multimodal, Integrative Therapies for the Self-Management of Chronic Pain Symptoms," Pain Medicine, vol. 15 (April 2014), p. S76-S85, doi: 10.1111/pme.12408.
[11] Institute of Medicine, p. 126
[12] See, for example, The Joint Commission's Pain Standards: Origins and Evolution, May 5, 2017 https://www.jointcommission.org/assets/1/6/Pain_Std_History_Web_Version_o5122m7.pdf (accessed September 28, 2018).
[13] Institute of Medicine, pp. 45-47.  Also: https://www.ncbi.nlm.nih.gov/pubmed/2873550.

45.     However, reducing the prescribing of opioid analgesics poses significant challenges for patients with legitimate medical problems.  Moreover, many chronic pain patients are already taking opioid analgesics, and many have done so for years.

46.     In 2010, the CDC began developing a guideline to provide "better clinician guidance on opioid prescribing and in 2016 issued its Guideline for Prescribing Opioids for Chronic Pain" ("CDC Guideline") "[14], which was intended as a voluntary set of recommendations aimed at primary care providers.

47.     At the 2018 Annual Meeting of the American Medical Association ("AMA"), the AMA House of Delegates referred to its Board of Trustees the second resolve of alternate Resolution 235, "Inappropriate Use of CDC Guidelines for Prescribing Opioids", which asked:

> [T]hat our AMA actively continue to communicate and engage with the nation's largest pharmacy chains, pharmacy benefit managers, National Association of Insurance Commissioners, Federation of State Medical Boards, and National Association of Boards of Pharmacy in opposition to communications being sent to physicians that include a blanket proscription against filing prescriptions for opioids that exceed numerical thresholds without taking into account the diagnosis and previous response to treatment for a patient and any clinical nuances that would support such prescribing as falling within standards of good quality patient care.[15]

48.     In 2019, the AMA Board of Trustees issued Report 22-A-19[16] in response, which provides in relevant part:

> The nation's opioid epidemic has led to extensive policy development in multiple areas - from several hundred new state laws and regulations to hundreds of millions of dollars earmarked by federal legislation for treatment of opioid use disorder, harm reduction efforts and other initiatives.
>
> *       *       *
>
> That is not, however, the only type of policymaking that has occurred.  Health insurance companies, national pharmacy chains and pharmacy benefit management companies

---

[14] Centers for Disease Control and Prevention, CDC Guideline for Prescribing Opioids for Chronic Pain United States, 2016, March 18, 2016, https://www.cdc.govimmwrivolumes/65/rrirr65olei.htm?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fmmwr%2Fvolumes%2F65%2Frr%2Frr65oleier.htm (accessed Sept. 15, 2018).

[15] https://www.ama-assn.org/system/files/2018-11/i18-refcomm-b-annotated.pdf, pp. 24-5.

[16] https://www.ama-assn.org/system/files/2019-08/a19-bot-reports.pdf, pp. 153-5.

(PBMs) all have - to varying degrees - implemented their own policies governing physician prescribing of controlled substances as well as patients' abilities to have a controlled substance prescription dispensed to them. The result of this type of quasi-regulation is incredibly difficult to quantify on a large-scale basis due to the lack of transparency in the public sphere, but the AMA and many medical societies continue to receive concerns from physicians and patients as to the disruptive nature of health plan, pharmacy chain or PBM interference in the patient-physician relationship.

*       *       *

. . . [N]ational pharmacy chains, health insurance companies and PBMs have implemented their own restrictive opioid prescribing policies. This report will not detail every iteration and difference between the policies except to say that most of the policies are some variation of the "CDC Guideline for Prescribing Opioids for Chronic Pain - United States, 2016" (the CDC Guideline). In the CDC Guideline's introduction, CDC stated:

> [T]he recommendations in the guideline are voluntary, rather than prescriptive standards. They are based on emerging evidence, including observational studies or randomized clinical trials with notable limitations. Clinicians should consider the circumstances and unique needs of each patient when providing care.

Yet, the CDC Guideline goes on to make two recommendations that appear in nearly all the pharmacy, payer and PBM policies:

> [Recommendation] 5. When opioids are started, clinicians should prescribe the lowest effective dosage. Clinicians should use caution when prescribing opioids at any dosage, should carefully reassess evidence of individual benefits and risks when considering increasing dosage to > 50 morphine milligram equivalents (MME)/day, and should avoid increasing dosage to > 90 MME/day or carefully justify a decision to titrate dosage to > 90 MME/day.

> [Recommendation] 6. Long-term opioid use often begins with treatment of acute pain. When opioids are used for acute pain, clinicians should prescribe the lowest effective dose of immediate-release opioids and should prescribe no greater quantity than needed for the expected duration of pain severe enough to require opioids. Three days or less will often be sufficient; more than seven days will rarely be needed.

. . . **It is important to note that CDC Guideline Recommendations 5 and 6 were intended guidelines for acute pain episodes, not a hard threshold, and not intended for chronic pain patients**.

*       *       *

At the same time, multiple national pharmacy chains implemented some variation of the CDC Guideline as their policy - a move the AMA warned would occur.

49.     The 2019 Recommendations of the AMA Opioid Task Force include the following:

The Task Force further affirms that some patients with acute or chronic pain can benefit from taking prescription opioid analgesics at doses that may be greater than guidelines or thresholds put forward by federal agencies, health insurance companies, pharmacy chains, pharmacy benefit management companies and other advisory or regulatory bodies. The Task Force continues to urge physicians to make judicious and informed prescribing decisions to reduce the risk of opioid-related harms, but acknowledges that for some patients, opioid therapy, including when prescribed at doses greater than recommended by such entities, may be medically necessary and appropriate. [17]

50.     The misapplication of the CDC Guideline has been felt in every state.  The problem is so pronounced that in one state, Alaska, the Board of Pharmacy sent a letter dated January 23, 2019 to all Pharmacists, stating:

The Board of Pharmacy has had an influx of communication concerning patients not able to get controlled substance prescriptions filled for various reasons, even when signs of forgery or fraudulence were not presented.

As a result of the increased "refusals to fill," the board is issuing the following guidance and reminders regarding the practice of pharmacy and dispensing of control substances:

1.  Pharmacists must use reasonable knowledge, skill, and professional judgment when evaluating whether to fill a prescription.  Extreme caution should be used when deciding not to fill a prescription.  A patient who suddenly discontinues a chronic medication may experience negative health consequences;

2.  Part of being a licensed healthcare professional is that you put the patient first.  This means that if a pharmacist has any concern regarding a prescription, they should attempt to have a professional conversation with the practitioner to resolve those concerns and not simply refuse the prescription.  Being a healthcare professional also means that you use your medication expertise during that dialogue in offering advice on potential alternatives, changes in the prescription strength, directions etc.  Simply refusing to fill a prescription without trying to resolve the concern may call into question the knowledge, skill or judgment of the pharmacist and may be deemed unprofessional conduct;

3.  Controlled substance prescriptions are not a "bartering" mechanism.  In other words, a pharmacist should not tell a patient that they have refused to fill a prescription and then

---

[17] https://www.end-opioid-epidemic.org/wp-content/uploads/2019/05/2019-AMA-Opioid-Task-Force-Recommendations-FINAL.pdf, p. 3.

explain that if they go to a pain specialist to get the same prescription then they will reconsider filling it. Again, this may call into question the knowledge, skill or judgment of the pharmacist;

4. Yes, there is an opioid crisis. However, this should in no way alter our professional approach to treatment of patients in end-of-life or palliative care situations. Again, the fundamentals of using our professional judgment, skill and knowledge of treatments plays an integral role in who we are as professionals. Refusing to fill prescriptions for these patients without a solid medical reason may call into question whether the pharmacist is informed of current professional practice in the treatment of these medical cases.

5. If a prescription is refused, there should be sound professional reasons for doing so. Each patient is a unique medical case and should be treated independently as such. Making blanket decisions regarding dispensing of controlled substances may call into question the motivation of the pharmacist and how they are using their knowledge, skill or judgment to best serve the public.

*     *     *

We all acknowledge that Alaska is in the midst of an opioid crisis. While there are published guidelines and literature to assist all healthcare professionals in up to date approaches and recommendations for medical treatments per diagnosis, do not confuse guidelines with law; they are not the same thing. Pharmacists have an obligation and responsibility under Title 21 Code of Federal Regulations 1306.04(a), and a pharmacist may use professional judgment to refuse filling a prescription. However, how an individual pharmacist approaches that particular situation is unique and can be complex. The Board of Pharmacy does not recommend refusing prescriptions without first trying to resolve your concerns with the prescribing practitioner as the primary member of the healthcare team. Patients may also serve as a basic source of information to understand some aspects of their treatment; do not rule them out in your dialogue. If in doubt, we always recommend partnering with the prescribing practitioner.[18]

51.    On April 24, 2019, the CDC issued a release addressing concerns about the misapplication of its Opioid Prescribing Guideline.[19] In the release, the CDC stated:

In a new commentary external icon in the *New England Journal of Medicine (NEJM)*, authors of the 2016 *CDC Guideline for Prescribing Opioids for Chronic Pain* (Guideline) advise against misapplication of the Guideline that can risk patient health and safety.

CDC commends efforts by healthcare providers and systems, quality improvement organizations, payers, and states to improve opioid prescribing and reduce opioid misuse and overdose. However, some policies and practices that cite the Guideline are inconsistent

---

[18] https://www.commerce.alaska.gov/web/portals/5/pub/pha_ControlledSubstanceDispensing_2019.01.pdf.
[19]    https://www.cdc.gov/media/releases/2019/s0424-advises-misapplication-guideline-prescribing-opioids.html.

with, and go beyond, its recommendations.  In the NEJM commentary, the authors outline examples of misapplication of the Guideline, and highlight advice from the Guideline that is sometimes overlooked but is critical for safe and effective implementation of the recommendations.

52.    On June 16, 2020, the AMA in response to a recent request by the CDC for comments on the CDC Guideline wrote[20] that many "misapply the CDC Guideline in different ways and have resulted in specific harm to patients," including the Walgreens' Good Faith Dispensing Policy.

53.    The AMA in its June 16, 2020 letter stated:

- Patients experiencing pain need to be treated as individuals, not according to one-size-fits-all algorithms and policies that do not take individual patient's needs into account. Yet, the CDC Guideline also included arbitrary dosage and quantity recommendations that have been consistently misapplied by state legislatures, national pharmacy chains, pharmacy benefit management companies, health insurance companies, and federal agencies. [21]

- Health disparities in pain management and legitimate access to opioid analgesics for pain remain evident, and clinically relevant differences in pain expression and responsiveness based on sex, race, ethnicity, and genetic constitution also exist.

- Patient groups, patients suffering from pain increasingly view themselves as collateral damage in efforts to restrict opioid prescribing decisions via state-based regulations and legislative mandates.

- The CDC has itself acknowledged the CDC Guideline's negative effect on access for patients with legitimate medical needs.

- A 2019 survey from the American Board of Pain Medicine found:[22]

  - 72 percent of pain medicine specialists said that they—or their patients—have been required to reduce the quantity or dose of medication they have prescribed.

  - 92 percent of pain medicine specialists said that they have been required to submit a prior authorization for non-opioid pain care.

---

[20]    https://searchlf.ama-assn.org/undefined/documentDownload?uri=%2Funstructured%2Fbinary%2Fletter%2FLETTERS%2F2020-6-16-Letter-to-Dowell-re-Opioid-Rx-Guideline.pdf.

[21] "The Task Force emphasizes the importance of individualized patient-centered care in the diagnosis and treatment of acute and chronic pain." U.S. Department of Health and Human Services (2019, May). Pain Management Best Practices inter-Agency Task Force Report: Updates, Gaps, Inconsistencies, and Recommendations. Retried from U.S. Department of Health and Human Services website: https://www.hhs.gov/ash/advisorycommittees/pain/reports/index.html.

[22] Second Annual Survey of Pain Medicine Specialists Highlights Continued Plight of Patients with Pain, and Barriers to Providing Multidisciplinary, Non-Opioid Care. American Board of Pain Medicine. Available at http://abpm.org/uploads/files/abpm%20survey%202019-v3.pdf.

- The AMA has heard from many physicians and patients from whom needed pain therapy with opioid analgesics was withheld based on a rationale that the treatment team was following the CDC guidance.

- Patients with sickle cell disease or advanced cancer have been accused of manufacturing acute pain and engaging in drug seeking behavior.

- Patients in hospice or who have cancer that opioid analgesics were denied because the prescribed amount did not comply with the CDC Guideline. These unintended but predictable consequences add to the stigma, racial, and other biases that these patients already face.

54.    The AMA concluded in its June 16, 2020 letter that:

- Multiple efforts need to be made to remove barriers such as prior authorization, step therapy, quantity limits, high cost-sharing, and coverage limitations on medications to evidence-based care, including ensuring patients have access to the right treatment at the right time.

- The Task Force further affirm that some recognize that patients with acute or chronic pain can benefit from taking prescription opioid analgesics at doses that may be greater than guidelines or thresholds put forward by federal agencies, health insurance plans, pharmacy chains, pharmacy benefit management companies, and other advisory or regulatory bodies.

- The CDC Guideline has harmed many patients[23]--so much so that in 2019, the CDC authors[24] and HHS issued long-overdue … clarifications that states should not use the CDC Guideline to implement an arbitrary threshold:

  Unfortunately, some policies and practices purportedly derived from the guideline have in fact been inconsistent with, and often go beyond, its recommendations.  A consensus panel has highlighted these inconsistencies, which include inflexible application of recommended dosage and duration thresholds and policies that encourage hard limits and abrupt tapering of drug dosages, resulting in sudden opioid discontinuation or dismissal of patients from a physician's practice.  The panel also noted the potential for misapplication of the recommendations to populations outside the scope of the guideline.   Such misapplication has been reported for patients with pain associated with cancer, surgical procedures, or acute sickle cell crises.  There have also been reports of misapplication of the guideline's dosage thresholds to opioid agonists for treatment of opioid use disorder.

- Many patients experience pain that is not well controlled, substantially impairs their quality of life and/or functional status, stigmatizes them, and could be managed with more compassionate patient care.

---

[23] Beth D Darnall, David Juurlink, Robert D Kerns, Sean Mackey, et al., International Stakeholder Community of Pain Experts and Leaders Call for an Urgent Action on Forced Opioid Tapering, Pain Medicine, Volume 20, Issue 3, March 2019, Pages 429-433, https://doi.org.10.1093/pm/pny228.,
[24] Deborah Dowell, M.D., M.P.H., Tamara Haegerich, Ph.D., Roger Chou, M.D., No Shortcuts to Safer Opioid Prescribing. June 13, 2019. N Engl J Med 2019; 380:2285-2287. DOI: 10.1056/NEJMp1904190.

00899636-1

- Treatment decisions for patients with pain must be made on an individualized basis. Opioid therapy should only be used when the benefits outweigh the risks, but there is no question that some patients benefit from opioid therapy including at doses that some may consider "high."

- Some situations exist where patients may have intractable pain and sufficient disability such that functional improvement is not possible, and relief of pain and suffering alone is a supportable primary goal.

## VI.

## WALGREENS & COSTCO

55.     Walgreens has implemented, and, upon information and belief, continues to use, a nationwide "Good Faith Dispensing" checklist in connection with opioid prescriptions. While purporting to comply with federal mandates and the CDC Guideline for opioid prescriptions, upon information and belief, Walgreens uses this checklist to "blacklist" individuals seeking to fill opioid prescriptions and/or their physicians prescribing the medication. In practice and application, this policy stigmatizes and discriminates against chronic pain patients and the Members of the National Class and the California Subclass, through no fault of such legitimate pain patients themselves or of the doctors caring for them.

56.     Moreover, upon information and belief, in or about 2013, Walgreens implemented limits on opioid prescriptions, which included limits on both dosage and duration.

57.     In addition to the foregoing, upon information and belief, Walgreens has adopted express or implicit requirements that opioid prescriptions not be filled unless accompanied with one or more prescriptions for non-opioid medication. In the alternative, such requirements are being imposed by individual pharmacists employed by Walgreens. There is no medical reason for this requirement, which results in unnecessary increased expenses and costs for Plaintiff and the Members of the National Class and the California Subclass.

00899636-1

58.    In addition to the foregoing, upon information and belief, Walgreens has adopted or will adopt express or implicit requirements that opioid prescriptions not be filled unless and until the person seeking the prescription provide comprehensive medical records which are then reviewed by a person, not licensed to practice medicine, or are accompanied with one or more prescriptions for non-opioid medication. In the alternative, such requirements are being imposed by individual pharmacists employed by Walgreens. There is no medical reason for these requirements, which results in unnecessary increased expenses and costs for Plaintiff and the Members of the National Class and the California Subclass.

59.    In addition to the forgoing, Walgreens has marketed and sold its Prescription Savings Club to Plaintiff and the Members of the National Class and the California Subclass, representing that members of the Prescription Savings Club can save up to 80% off cash retail prices for prescriptions purchased from participating Walgreens pharmacies. To be a member of the Prescription Savings Club, Walgreens charges an annual fee. Plaintiff and the Members of the National Class and the California Subclass are particularly drawn to join and use the Prescription Savings Club, as the cash prices for opioid medication without insurance coverage is exorbitant. Upon information and belief, as of July 2020, Walgreens has removed all opioid prescription medications from use with the Prescription Savings Club. In the alternative, some individual pharmacists employed by Walgreens are refusing to honor the Prescription Savings Club discounts for prescription opioid medication.

60.    While some may be laudable in concept, the express and implicit policies as adopted and applied by Walgreens are misguided attempts to reduce illicit access to painkillers by punishing patients who have, and need, legitimate access to such medication. In practice and application, they

a.  Interfere with the physician-patient relationship between Plaintiff, and the Members of the National Class and the California Subclass, and their physicians, effectively engaging in the unauthorized practice of medicine;

b.  Stigmatize and discriminate against Plaintiff, and the Members of the National Class and the California Subclass, through no fault of legitimate pain patients themselves or of the doctors caring for them;

c.  Discriminate against Plaintiff, and the Members of the National Class and the California Subclass, based on age; and

d.  Ignore the real problems with opioid abuse and foist the responsibility for the epidemic on Plaintiff, and the Members of the National Class and the California Subclass.

61.     Further, Walgreens's express and implicit policies have led to actions taken by its employees and agents, approved by Walgreens, such as:

a.  Telling customers, including Plaintiff and the Members of the National Class and the California Subclass, that they do not have the prescribed medication in stock without checking to see whether the medication is in fact in stock or when the medication will be in stock;

b.  Reducing the stock of certain opioid medication;

c.  Refusing to fill a prescription for opioids unless additional non-opioid prescriptions are presented for filling;

d.  Refusing to fill prescriptions from certain medical providers;

e.  Making subjective determinations about the patient's reasons and need for the prescribed medication; and/or

f.  Focusing more on risk management than the needs of the patient.

62.     Proponents of Walgreens's policies might argue that the limitations and refusal to fill opioid prescriptions does not prevent the patient from getting the prescription filled elsewhere or getting additional prescriptions if the pain persists, but that puts even more of a burden on a patient who is already unwell and suffering.  Plaintiff and the Members of the National Class and the California Subclass, who are afflicted with complex health conditions, already spend hours a week in doctors' offices and on the phone with insurers and billing departments, have limited access to transportation, and are already hindered by pain and fatigue.

00899636-1

63.      Walgreens is the second largest retail pharmacy chain in the United States, filing more than 1.2 billion prescriptions in 2019 in all 50 states, the District of Columbia, Puerto Rico, and the Virgin Islands and serving more than 8 million customers per day.[25]

64.      Walgreens's 2019 financial statement reflects total revenue of $136.9 billion, Total Revenue Retail Pharmacy USA of $104.5 billion and that 78% of the U.S. population lives within 5 miles of a Walgreens owned pharmacy.  Walgreens owns and operates retail pharmacies under the Walgreens and Duane Reade trade manes.  Walgreens's financial statement further states that it has (i) approximately 9,277 retail locations, (ii) approximately 88,000 healthcare service providers, and (iii) owns an approximate 27% stake in AmerisourceBergen – a company which supplies and distributes a significant amount of generic and branded pharmaceutical products to Walgreens owned pharmacies, including opiates.[26]

65.      Costco operates a chain of membership warehouses with 101.8 million cardholding members and 548 warehouse locations in 45 states and Puerto Rico.  It also operates pharmacies; however, customers are not required to be a Costco member to fill their prescription at Costco warehouses.  Its total revenue for the fiscal year ending in September 2019 was $149.4 billion.  In addition to its warehouses, Costco offers mail order prescription services.

66.      Upon information and belief, Costco flatly refuses to fill prescriptions for opioid medication or possibly for certain opioid medication, either as a matter of express or implicit policy.  In the alternative, individual pharmacists employed by Costco are flatly refusing to fill prescriptions for opioid medication or possibly for certain opioid medication.  While possibly laudable in concept, this express and implicit policy as adopted and applied by Costco is a misguided attempt to reduce

---

[25] https://news.walgreens.com/fact-sheets/frequently-asked-questions.htm.
[26] https://s1.q4cdn.com/343380161/files/doc_financials/2019/annual/2019-Annual-Report-Final.pdf

illict access to painkillers and/or certain painkillers by punishing patients who have, and need, legitimate access to such medication.  In practice and application, it

    a. Interferes with the physician-patient relationship between Plaintiff, and the Members of the National Class and the California Subclass, and their physicians, effectively engaging in the unauthorized practice of medicine;

    b. Stigmatizes and discriminates against Plaintiff, and the Members of the National Class and the California Subclass, through no fault of legitimate pain patients themselves or of the doctors caring for them;

    c. Discriminates against Plaintiff, and the Members of the National Class and the California Subclass, based on age; and

    d. Ignores the real problems with opioid abuse and foist the responsibility for the epidemic on Plaintiff, and the Members of the National Class and the California Subclass.

67.     Costco offers a Costco Member Prescription Program which is a prescription drug discount card program that provides eligible Costco members and their eligible dependents with the ability to obtain lower prices on all medications with saving that range from 2% to 40% or more depending on the drug.[27]  However, the savings under this Program are not available to Plaintiffs or the Members of the National Class and the California Subclass if Costco will not fill prescriptions for opioid medication or possibly certain opioid medication.

**VII.**

**PLAINTIFF'S ALLEGATIONS**

68.     Plaintiff Susan Smith is a 43-year old married mother with one son.  At the age of 17 years old, she was diagnosed with Epilepsy, as a result of repeated head trauma from child abuse she had endured since the age of 4.

69.     In June 2010, while driving, Mrs. Smith suffered a seizure, causing an automobile accident in which the engine block went into her right leg, crushing her lower leg, breaking all bones in her right ankle, causing open compound fracture to her tibia and fibula, and a knee injury and giving

---

[27] https://www.costco.com/member-prescription-program-frequently-asked-questions.html

her a severe concussion. She had surgery in which rods, pins and screws were inserted to repair her leg and ankle. She has had 6 surgeries to repair her knee, leg and ankle since 2010, with another surgery pending. In addition to opioids for pain, Mrs. Smith had several Cortisone injections in her knee and was prescribed Lidocaine patches for pain without success. She also developed chronic back pain as a result of the accident and surgeries. In 2011, the Social Security Administration found Mrs. Smith to be disabled as of June 25, 2010, the date of her car accident.

70.     Mrs. Smith's intractable Epilepsy continued to worsen over time. The Epilepsy causes her to suffer from migraines, Complex Partial Seizures and Grand Mal seizures. The migraine headaches are near constant and can be so severe that at times she cannot walk, will lose her vision and experience extreme bouts of nausea and vomiting. The migraines can last for extended periods, including one that lasted as long as 25 days. She also has Complex Partial Seizures on an almost daily basis. These seizures give her a tingling feeling with a taste of tin in her mouth and leave her lightheaded, dizzy, nauseous and tired. These seizures can last up to 30 minutes. The Grand Mal seizures, however, are worse. They can cause Mrs. Smith to lose consciousness for up to 30 minutes and result in her body becoming rigid and shaking.

71.     In addition to migraines and seizures, Mrs. Smith suffers from Chronic Pain Syndrome, which causes pain in her joints. It is believed to result from an autoimmune problem. She also has swelling in her feet and face, which, it has been suggested, may be due to a heart defect, though her doctors are unable to determine the precise cause. She also suffers from chest pain and heart palpitations, the cause of which is unknown at this time.

72.     In September 2010, Mrs. Smith's neurologist advised her that he could no longer treat her seizures given their severity and that she needed to be seen by an Epileptologist right away. At this point, her care was taken over by an Epileptologist and a Neurosurgeon. She was advised that she

would need brain surgery to try to stop the Epilepsy seizures. In July 2011, after 6 months of testing which revealed that she had Mesial Temporal Lobe Sclerosis of her brain, Mrs. Smith was told that the damage to her brain from this extreme form of scar tissue caused by her past seizures was so severe that she likely had 3 months to live. In September 2011, Mrs. Smith had surgery to remove the scar tissue on her brain. The surgery did not cure her Epilepsy but did reduce its effects for a time. It also left her lethargic and actually intensified her migraine headaches. For Mrs. Smith, the nightmare of these migraines is never ending.

73.    Unfortunately for Mrs. Smith, traditional anti-seizure and migraine medications are not an option for her. Mrs. Smith sadly has 15 documented medical allergies including to Triptans, specifically, Sumatriptans, which are the class of medications which have been developed to treat migraines.

74.    In sum, Mrs. Smith has been diagnosed with Mesial Temporal Lobe Sclerosis, Intractable Epilepsy w/Grand Mal Seizures, Partial Complex Seizures, Hypothyroidism/Graves Disease, Cyclical Vomiting Syndrome, Chronic Pain Syndrome, Chronic Fatigue, Peripheral Edema, Asthma, Osteoarthritis, Chronic Abdominal Pain, Degenerative Disc Disease throughout her back, Generalized Anxiety Disorder secondary to medical condition, Chronic Migraine and Mood Disorder secondary to medical condition.

75.    As a result of her conditions, Mrs. Smith is restricted in her ability to drive and has difficulty lifting, squatting, bending, standing, walking, sitting, kneeling, climbing stairs, processing information, concentrating and focusing. She is unable to handle household chores, such as cleaning, laundry, minor repairs, taking care of the yard, on her own on a regular basis and needs assistance getting dressed and bathing. She is unable to sit or stand for long periods. Since 2014, she has used crutches and/or a walker for assistance when the pain from her headaches or knees and feet is severe

or when she is unstable due to seizures, migraines or dizziness.  She no longer does any cooking requiring the use of a stove.  The pain from her migraines can give her insomnia and there are times when she has spent 5 days without sleep.  She goes outside of her house maybe 1 or 2 times a month and does not go alone unless absolutely necessary.  Her only regular outside activities are her monthly doctor appointments.  She takes medicine which causes her to be sleepy and can cause numbness in her hands and feet.  Most days, Mrs. Smith is so sick she cannot shower or get dressed.

76.    The only medications Mrs. Smith can take to provide her with any sort of relief from the extreme pain are opioids.  Accordingly, Mrs. Smith has been prescribed Morphine for her chronic pain since 2011 and has taken the same dose, prescribed by the same physician, a NeuroPsychiatrist specializing in traumatic brain injury and pain management, since 2012.[28]

77.    For the past 8 years, Mrs. Smith has had difficulties with pharmacists at Walgreens and Costco filling her opioid prescription and has faced discrimination, ridicule and outright harassment by Defendants' pharmacists as a result of her chronic pain condition.

78.    Each month is a constant struggle for Mrs. Smith, exacerbated by the needless fear and anxiety caused by Defendants as to whether or not they will fill her valid prescription as she is run through a needless gauntlet, depriving her of her dignity and treating her like a criminal or an addict, all as Mrs. Smith seeks to get the medication she so desperately needs.

79.    On one such occasion, Mrs. Smith went to her local Castro Valley Walgreens to have her opioid prescription filled.  The pharmacist on duty told Mrs. Smith that her doctor would need to fill out 5 detailed medical forms describing her medical and treatment history and fax them back to for review before the pharmacist would fill Mrs. Smith's prescription.  Mrs. Smith, called her

[28] Mrs. Smith was initially prescribed the opioid Vicodin in 2008 for her migraines, after discovering her allergy to Triptans. After her automobile accident, her physician switched her to morphine due to her increased pain.

00899636-1

physician while she was at the pharmacy and relayed the pharmacist's instruction. Mrs. Smith's physician agreed to comply with the request, completed and faxed back the medical forms.

80.    Several hours when Mrs. Smith returned to the Walgreens pharmacy to pick up her prescription, despite having received the 5 pages of medical forms from her physician, the pharmacist still refused to fill Mrs. Smith's prescription. The Walgreens pharmacist informed Mrs. Smith that she would not fill her opioid prescription because her doctor had not doted the "i" in the word morphine. At no time during the several phone calls with Mrs. Smith's physician, requesting sensitive medical information the pharmacist had no authority to request or review, did she inform the pharmacist that the "dot" was missing above the "i" in morphine.   Nor did the pharmacist alert Mrs. Smith to this fact hours before when she had initially come to have her prescription filled. Instead the pharmacist just refused to fill the prescription.

81.    Mrs. Smith contacted Walgreens corporate to complain about the incident. Without authorization, the Walgreens employee told Mrs. Smith he was "looking at her prescription history." After his review of her prescription history, Mrs. Smith detected a change in the employee's demeanor. He immediately became dismissive of her plight, telling her "we filled it last month, so what?" After learning that Mrs. Smith is a chronic pain patient and has a prescription for opioids to treat that chronic pain, the Walgreens employee acted as if Mrs. Smith was a nuisance or a drug addict.

82.    This was not an isolated incident as to how Walgreens employees berated and discriminated against Mrs. Smith, treating her as an "addict."

83.    In 2017, after just having had orthopedic surgery, the orthopedic physician prescribed her additional pain medications due to her severe medical allergy and pre-existing chronic pain condition. The physician told Mrs. Smith to tell the pharmacist to call him so he could explain her medical condition and the reason for the prescription. Rather than pick up the phone and contact her

physician as Mrs. Smith was instructed and had requested, the Walgreens pharmacist just flatly refused to call or fill the prescription; telling Mrs. Smith "maybe you should try rehab instead of pain meds."

84.    On a couple occasions, Walgreens would not fill her prescription because her doctor had not written an ICD code with and on the prescription.  Upon returning to Walgreens with the ICD code written on the prescription, the pharmacist still refused to fill the prescription because the pharmacist did not agree with her doctor's prescribing of Morphine for the ICD codes he used.  On another occasion while using the drive thru drop off/pick up at Walgreens, the pharmacist said Walgreens had her medication in stock and then proceeded to ask if she would like to fill a prescription for Narcan at the same time.  Mrs. Smith had no idea what Narcan was and declined.  Because Mrs. Smith declined the Narcan, the pharmacist gave the prescription back refusing to fill it and walked away from the window so Mrs. Smith could not question her any further.

85.    More recently, when attempting to have her valid prescription filled, a Walgreens pharmacist thought it would be appropriate to make fun of Mrs. Smith and denigrate her.  Mrs. Smith timely brought her opioid prescription to a local Walgreens pharmacy.  When she presented it, the pharmacy tech looked it over and then went back to speak with the pharmacist.  Mrs. Smith could audibly hear the pharmacist laugh at her and heard the pharmacist instruct the tech that they did not have the right morphine, she would have to come back after midnight to get her prescription.  The pharmacy tech returned to the counter and informed Mrs. Smith that the pharmacist didn't want to fill the prescription and added "you already know CVS won't fill your prescription."  Not understanding to what the pharmacy tech was referring, Mrs. Smith asked why and was told that she could not pick up her prescription until after midnight.  Still not understanding what was going on, Mrs. Smith inquired further.  Without explaining the comment about CVS, the pharmacy tech went back to the

pharmacist, and again she could hear their conversation. Mrs. Smith heard the pharmacist say loudly to the pharmacy tech: "Tell that dumb bitch it won't be ready until after midnight."

86.    In addition to the foregoing, several years ago, after realizing that many insurance companies would not cover the cost of her opioid prescription, Mrs. Smith learned about and was sold Walgreens Prescription Saving Club. Walgreens markets this club not as insurance but as a savings club for prescription medications.

87.    To signup, Mrs. Smith had to pay a $25 yearly fee. Walgreens represented that Mrs. Smith would save up to 80% on her prescriptions, and for a while she in fact did. For example, normally her morphine prescription without subsidies costs $400. With the Prescription Savings Club, Mrs. Smith's prescription cost her only $60. Without notice or reason, Mrs. Smith was refused the discount on her morphine prescription in July 2020 and was told that as of July 2020, Walgreens would no longer accept and apply the Prescription Savings Club discount to her prescription. However, in August 2020, Walgreens did apply the discount, leaving Mrs. Smith uncertain as to the applicability of the discount in the future.

88.    Month after month, year after year, Mrs. Smith has been subjected to the above described harassment and discrimination by Walgreens for no reason other than the fact that she has chronic pain and is prescribed opioids to treat it. Mrs. Smith goes to at least two to four Walgreens a month to try to get her prescription filled. Often, she is denied by being simply told the prescription cannot be filled because she does not live in that neighborhood. Other times her prescription is refused on the basis that insurance will not cover the full amount for what she is prescribed, notwithstanding the fact that she offers to pay cash.

89.    Walgreens's discriminatory actions and harassment have subjected Mrs. Smith to unnecessary stress. Every month she has to endure the anxiety of what excuse or beratement she will

have to go through to try to get her prescription filled. Every month she has to check the calendar to make sure the date is correct; to make sure she is in town when her prescription comes due; and has to count each pill to make sure the count is spot on, as Walgreens has made her to feel like a pariah, even demanding that she bring in her pills to prove how many she has left.

90.    Walgreens acted intentionally and with deliberate indifference to the strong likelihood that a violation of federally protected rights would result from the implementation of their foregoing policies and actions. Walgreens knew that harm to Mrs. Smith's federally protected right was substantially likely and failed to act on that likelihood.

91.    Mrs. Smith has suffered compensatory damages due to Walgreens' intentional discrimination and deliberate indifference. Since at least 2017, at least once a month, she and her husband have to spend hours driving around looking for a Walgreens pharmacy that will fill her prescriptions for opioid medication despite the fact that there is a Walgreens pharmacy close to her home. In addition to the pain-and-suffering she experiences in having to undertake these trips and her mental anguish and fear wondering where and whether she will be able to get her prescriptions for opioid medication filled, Walgreens' actions have caused her to incur unnecessary increased expense for gas and unnecessary wear and tear of her car.

92.    If Walgreens ended its discrimination, she would definitely seek to have her prescriptions for opioid medication filled at Walgreens.

93.    Similarly, Mrs. Smith has had her prescriptions for opioid medication rejected without explanation by Costco. There are two Costco warehouses located in Danville and Livermore, Ca. near her home. At one of the warehouses, she presented her prescription for opioid medication and the pharmacist would not entertain filling it, giving it back to her without explanation. Her husband, who was with her, pleaded with the pharmacist to fill the prescription, but was flatly told "no." At the other

warehouse, Mrs. Smith tried talking to the pharmacy manager, who told her that Costco did not sell her medication, then walked away leaving her prescription on the counter.

94.     Mrs. Smith and/or her family members continue to shop for other items weekly at the Costco warehouses located in Danville and Livermore, Ca.  Given the flat rejection of her prescriptions for opioid medication, Mrs. Smith considers it futile to seek to have her prescriptions filled at Costco.

95.     Costco acted intentionally and with deliberate indifference to the strong likelihood that a violation of federally protected rights would result from the implementation of their foregoing policies and actions.   Costco knew that harm to Mrs. Smith's federally protected right was substantially likely and failed to act on that likelihood.   Costco's discriminatory actions and harassment have subjected Mrs. Smith to unnecessary stress, emotional distress and mental anguish. However, if Costco ended its discrimination, she would definitely also seek to have her prescriptions for opioid medication filled at Costco as well as Walgreens.

96.     As a direct and proximate result of the Defendants' delays and refusals of Mrs. Smith's prescription opioids, Mrs. Smith has/will suffer(red) debilitating pain and neurological compromise that is searing, disabling and medically dangerous.

## VIII.

## CAUSES OF ACTION

### COUNT I
### Violation of Americans with Disabilities Act
(42 U.S.C. §12101 *et seq*)

97.     Plaintiff repeats, realleges and adopts paragraphs 1 through 96 above as if fully set forth herein.

98.     Title III of the Americans with Disabilities Act ("ADA") provides that "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment

of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. §12182(a).

99.    Plaintiff, and the Members of the National Class and the California Subclass, are qualified individuals with a "disability" within the meaning of the ADA. As chronic pain patients who require opioid pain medication, they have "a physical or mental impairment that substantially limits one or more major life activities."

100.    Defendants own, lease and/or operate places of public accommodation within the meaning of the ADA.

101.    On the basis of their disability, Plaintiff, and the Members of the National Class and the California Subclass, are discriminated against and deprived of the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of the places of public accommodation owned, leased and/or operated by Defendants through their adoption, use and application of policies, practices and procedures which, among other things, result in (i) the refusal to dispense opioid medication as prescribed (either in amount or strength) when presented with legitimate prescriptions from patients suffering from chronic pain or pain associated with a cancer diagnosis, palliative or nursing home care or sickle cell anemia; (ii) the requirement that Plaintiff, and the Members of the National Class and the California Subclass, present and/or purchase additional prescription medication or present other information in order to have her opioid prescriptions filled; (iii) the decision of whether to fill a legitimate opioid prescription being made by someone other than a medical doctor licensed to practice medicine and/or (iv) Plaintiff, and the Members of the National Class and the California Subclass, being blacklisted, flagged or otherwise included on a list or database as potentially abusing opioid medication.

102.    Defendants' conduct is ongoing and continuous, and Plaintiff, and the Members of the National Class and the California Subclass, have been harmed and continue to be harmed by Defendants' conduct. Unless Defendants are restrained from continuing their ongoing and continuous course of conduct, Defendants will continue to violate the ADA and will continue to inflict injury upon Plaintiff and the Members of the National Class and the California Subclass.

103.    Plaintiff, and the Members of the National Class and the California Subclass, are entitled to injunctive relief and reasonable attorney's fees and costs from Defendants for their violation of the ADA. Specifically, Plaintiff and the Members of the National Class and the California Subclass request this Court:

    a.  Enjoin Defendants from refusing to dispense opioid medication as prescribed when presented with legitimate prescriptions from patients suffering from chronic pain or pain associated with a cancer diagnosis, palliative or nursing home care or sickle cell anemia;

    b.  Enjoin Defendants from requiring that Plaintiff and the Members of the National Class and the California Subclass present prescriptions for, and/or purchase, additional prescription medication in order to have their opioid prescriptions filled;

    c.  Enjoin Defendants from requiring that Plaintiff and the Members of the National Class and the California Subclass present additional information or documentation in order to have their opioid prescriptions filled when presented with a valid prescription;

    d.  Enjoin Defendants from making, and/or allowing to be made, the decision of whether to fill an opioid prescription by someone other than a medical doctor licensed to practice medicine;

    e.  Order Defendants to develop opioid policies, and train their employees, agents, representatives, contractors and staff on such policies, that distinguish between acute pain patients and patients suffering from chronic pain or pain associated with a cancer diagnosis, palliative or nursing home care or sickle cell anemia;

    f.  Order Defendants to produce and explain their use of all databases and data analytics employed in connection with patients presenting prescriptions for opioid medication;

    g.  Order Defendants to identify any the Members of the National Class and the California Subclass who has been blacklisted, flagged or otherwise included on a list or database as potentially abusing opioid medication and clear the Members of the National Class and the California Subclass from such list or database;

h.  Order Defendants to pay Plaintiff's and the Class' reasonable attorney's fees and costs; and/or

i.  Order all other relief to which Plaintiff, and the Members of the National Class and the California Subclass, are justly entitled.

## COUNT II
### Violation of Section 504 of the Rehabilitation Act of 1973
### (29 U.S.C. §794)

104.    Plaintiff repeats, realleges and adopts paragraphs 1 through 96 above as if fully set forth herein.

105.    At all times relevant to this action, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794, was in full force and effect in the United States.

106.    The Rehabilitation Act forbids programs or activities receiving Federal financial assistance from, among other things, discriminating against otherwise qualified individuals with disabilities.

107.    Plaintiff, and the Members of the National Class and the California Subclass, are qualified individuals with disabilities within the meaning of the Rehabilitation Act. As chronic pain patients who require opioid pain medication, they have "a physical or mental impairment that substantially limits one or more major life activities."

108.    Defendants are subject to the Rehabilitation Act due to the fact that, upon information and belief, they receive Federal financial assistance from the United States Department of Health and Human Services, including Medicare provider payments from the centers for Medicare/Medicaid Services under Title XVIII, Part D of the Social Security Act, 42 U.S.C. §1395 *et seq*. In addition, Costco provides a Mortgage Program for Costco Members[29], which mortgages receive, upon information and belief, Federal financial assistance through various Governmental entities.

---

[29] https://www.costco.com/mortgage-services.html

109.    Defendants, through their discriminatory practices towards the Plaintiff and the Members of the National Class and the California Subclass, based upon their disabilities and solely by reason of their disabilities, have violated and continue to violate the Rehabilitation Act by, *inter alia*, denying disabled individuals, including Plaintiff and the Members of the National Class and the California Subclass, the full and equal goods, services, facilities, privileges, advantages or accommodations of their retail pharmacies throughout the United States.

110.    Defendants' conduct has harmed Plaintiff and the Members of the National Class and the California Subclass and will continue to harm Plaintiff and the Members of the National Class and the California Subclass.   Unless Defendants are restrained from continuing their ongoing and continuous course of conduct, Defendants will continue to violate the ADA and will continue to inflict injury upon Plaintiff and the Members of the National Class and the California Subclass.  Plaintiff, and the Members of the National Class and the California Subclass, are entitled to injunctive relief and reasonable attorney's fees and costs from Defendants for their violation of Section 504 of the Rehabilitation Act.   Plaintiff and the Members of the National Class and the California Subclass request this Court unless and until Defendants are ordered by this Court to cease the following activities:

a.   refusing to dispense opioid medication as prescribed when presented with legitimate prescriptions from patients suffering from chronic pain or pain associated with a cancer diagnosis, palliative or nursing home care or sickle cell anemia;

b.   requiring that Plaintiff and the Members of the National Class and the California Subclass present prescriptions for, and/or purchase, additional non-opioid prescription medication in order to have their opioid prescriptions filled;

c.   requiring that Plaintiff and the Members of the National Class and the California Subclass present additional information or documentation in order to have their opioid prescriptions filled; and

d.   making, and/or allowing to be made, the decision of whether to fill an opioid prescription by someone other than a medical doctor licensed to practice medicine.

111.     In addition to injunctive relief, Defendants' conduct has caused damages to Plaintiff and the Members of the National Class and the California Subclass, which they are entitled to recover.

**COUNT III**
**<u>Violation of the Anti-Discrimination</u>**
**<u>Provisions of the Affordable Care Act</u>**
**(42 U.S.C. §18116)**

112.     Plaintiff repeats, realleges and adopts paragraphs 1 through 96 above as if fully set forth herein.

113.     Section 1557 of the Patient Protection and Affordable Care Act ("ACA") (codified at 42 U.S.C. §18116) was established to combat healthcare discrimination by any health program, healthcare entity, or activity that receives federal funding.  This Act of Congress makes it illegal to discriminate against individuals based upon their race, national origin, gender, age, or disability.  Section 1557 of the ACA protects individuals from discrimination in any health program or activity of a recipient of federal financial assistance, such as hospitals, clinics, employers, retail community pharmacies or insurance companies that receive federal money.  Section 1557 specifically extends its discrimination prohibition to entities that receive federal financial assistance in the form of contracts of insurance, credits, or subsidies, as well as any program or activity administered by an executive agency, including federal health programs like Medicare, Medicaid, and CHiP.

114.     42 U.S.C. §18116, ADA Section 1557, provides in pertinent part as follows:

> (a) . . . an individual shall not, on the ground prohibited under… section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794), be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments).  The enforcement mechanisms provided for and available under such title VI, title IX, section 504, or such Age Discrimination Act shall apply for purposes of violations of this subsection.
> ACA § 1557, 42 U.S.C. §18116(a)

115.    Under 42 U.S.C. §1396r–8(k)(10), "Retail Community Pharmacy" means an independent pharmacy, a chain pharmacy, a supermarket pharmacy, or a mass merchandiser pharmacy that is licensed as a pharmacy by the State and that dispenses medications to the general public at retail prices.

116.    Recipients of Federal financial assistance, such as Defendants, are prohibited from providing "any service, financial aid, or other benefit to an individual which is different, or is provided in a different manner, from that provided to others under the program." *See* 45 C.F.R. §80.3(a)(ii). Federal financial assistance has been interpreted and enforced to cover a broad range of programs receiving federal funds.

117.    Defendants are subject to Section 1557 due to the fact that, upon information and belief, they receive Federal financial assistance from the United States Department of Health and Human Services, including Medicare provider payments from the centers for Medicare/Medicaid Services under Title XVIII, Part D of the Social Security Act, 42 U.S.C. §1395 *et seq*. In addition, Costco provides a Mortgage Program for Costco Members[30], which mortgages receive Federal financial assistance through various Governmental entities.

118.    Defendants meet the qualifications for being a "health program or activity, any part of which is receiving Federal financial assistance" under Section 1557(a).

119.    Furthermore, Walgreens represents that it is subject to Section 1557 of the ACA, and under that law:

> Walgreens complies with applicable civil rights laws and does not discriminate, exclude people or treat them differently on the basis of race, color, national origin, age, sex, **disability** or any other legally protected characteristic.

(*See* https://www.walgreens.com/topic/information/access-to-services.jsp, emphasis added).

---

[30] https://www.costco.com/mortgage-services.html

120.    Chronic pain and the underlying medical conditions from which the Plaintiff and the Members of the National Class and the California Subclass suffer is a "disability" under both federal and state laws.   As chronic pain patients who require opioid pain medication, they have "a physical or mental impairment that substantially limits one or more major life activities."   Accordingly, Plaintiff and the Members of the National Class and the California Subclass are considered disabled under both the ADA and Section 504 of the Rehabilitation Act.   The discriminatory actions of the Defendants alleged herein were undertaken on the basis of and solely by reason of Plaintiff's disabilities and the disabilities of the Members of the National Class and the California Subclass.   Due to Defendants' acts of discrimination, *inter alia*, refusing to dispense opioid medication as prescribed when presented with legitimate prescriptions from patients suffering from chronic pain or pain associated with a cancer diagnosis, palliative or nursing home care or sickle cell anemia; requiring that Plaintiff and the Members of the National Class and California Subclass present prescriptions for, and/or purchase, additional non-opioid prescription medication in order to have their opioid prescriptions filled; requiring that Plaintiff and the Members of the National Class and the California Subclass present additional information or documentation in order to have their opioid prescriptions filled; and making, and/or allowing to be made, the decision of whether to fill an opioid prescription by someone other than a medical doctor licensed to practice medicine, Plaintiff and the Members of the National Class and the California Subclass have not been provided meaningful access to their life-sustaining medications.

121.    Defendants' actions have violated and continue to violate Section 1557(a) of the Affordable Care Act by intentionally causing Plaintiff and the Members of the National Class and the California Subclass to "be excluded from participation in, be denied the benefits or, or be subjected to

discrimination under any health program or activity, any part of which is receiving Federal financial assistance" based on disability which is a prohibited ground of discrimination under Title IX.

122.    Plaintiff and the Members of the National Class and the California Subclass have suffered damages by this violation of Section 1557(a) in the denial of access to necessary medical care and/or services including, though not limited to, the filing and receipt of their valid opioid prescription medication.

123.    Plaintiff and the Members of the National Class and the California Subclass request Declaratory and injunctive relief to protect their rights under Section 1557(a), and to remedy the Defendants' continued violation of Section 1557(a).

124.    Plaintiff and the Members of the National Class and the California Subclass have been harmed as a result of Defendants' conduct and are entitled to compensatory damages, injunctive relief, attorneys' fees and costs, and all other additional appropriate relief as may be available under this cause of action and the applicable law.

## COUNT IV
## <u>Violation of Unruh Civil Rights Act</u>
### (Cal. Civ. Code §51, *et seq.*)

125.    Plaintiff repeats, realleges and adopts paragraphs 1 through 96 above as if fully set forth herein.  This claim is also brought on behalf of the Members of the California Subclass.

126.    The Unruh Civil Rights Act, California Civil Code section 51(b), provides: "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, or sexual orientation are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."  Additionally, pursuant to §51(f)

of the Unruh Civil Rights Act, "a violation of the right of any individual under the federal Americans with Disabilities Act…shall also constitute a violation the Act."

127.    Defendants' discriminatory conduct alleged herein includes, *inter alia*, the violation of the rights of persons with disabilities set forth in Title III of the ADA and therefore also violates the Unruh Act. Cal. Civ. Code §51(f).

128.    As described above, the discriminatory acts of Defendants, in their refusal to fill valid opioid prescriptions and/or refusing to apply bargained for savings for previously covered medications, have denied Mrs. Smith and the Members of the California Subclass access and service to the medications to which they are entitled.

129.    Defendants' conduct violates the Unruh Act because their policies and practices deny Plaintiff and the Members of the California Subclass the full and equal accommodations, advantages, facilities, privileges, and services of Defendants' business establishment on the basis of their disabilities.

130.    Defendants operate business establishments within the jurisdiction of the State of California and is obligated to comply with the provisions of the Unruh Civil Rights Act.

131.    Pursuant to §51(a) of the Unruh Civil Rights Act, anyone who denies, aids or incites a denial, or makes any discrimination or distinction contrary to the Unruh Act, Civil Code §51, is liable for each and every offense for the actual damages, and any amount that may be determined by a jury, or a court sitting without a jury, up to a maximum of three times the amount of actual damage but in no case less than four thousand dollars ($4,000), and any attorney's fees that may be determined by the court in addition thereto.

132.    Additionally, Plaintiff and the Members of the California Subclass are entitled to injunctive relief to remedy Defendants' discrimination, as well as damages for past harm, attorney's

00899636-1

fees, and costs, and all other additional appropriate relief as may be available under this cause of action and the applicable law.

**COUNT IV**
**Violation of California Unfair Competition Law**
**(Cal. Bus. & Pro. Code §17200, *et seq.*)**

133.    Plaintiff repeats, realleges and adopts paragraphs 1 through 96 above as if fully set forth herein.  This claim is also brought on behalf of Members of the California Subclass.

134.    The California Unfair Competition Law (UCL) prohibits any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising.

135.    The UCL imposes strict liability.  Plaintiff and the Members of the California Subclass need not prove that Defendants intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices – but only that such practices occurred.

136.    A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practice against the gravity of the harm to the alleged victims.

137.    Each defendant is a "person" as defined by Ca. Bus. & Pro. Code §17201.

138.    Defendants' actions constitute "unfair" business practices because, as alleged above, Defendants engaged in misleading and deceptive practices in their refusal to fill legitimate opioid prescriptions.  Defendants' acts and practices offended an established public policy, and engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

139.    The harm to Plaintiff and the Members of the California Subclass outweighs the utility of Defendants' practices.   There were reasonably available alternatives to further Defendants'

legitimate business interests other than the, discriminatory, misleading, and deceptive conduct described herein.

140.   A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

141.   Defendants' acts and practices alleged above constitute fraudulent business acts or practices as they have deceived Plaintiff and the Members of the California Subclass, members of the consuming public.  Plaintiff and the Members of the California Subclass relied on Defendants' fraudulent and deceptive representations that they would fill their valid prescriptions for opioid medication and/or regarding the reasons they gave for refusing to fill Plaintiff's valid prescription or honor a discounted price for Plaintiff's medication.

142.   Further, a business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

143.   Defendants' acts and practices alleged above constitute unlawful business acts or practices as they have violated state and federal law as described herein.

144.   Defendants' practices, as set forth above, have misled Plaintiff and the Members of the California Subclass in the past and will continue to mislead in the future.  Consequently, Defendants' practices constitute an unlawful, fraudulent, and unfair business practice within the meaning of the UCL.

145.   Defendants' acts and omissions alleged herein violate the UCL, including Defendants' violations of the ADA, Rehabilitation Act and the ACA.  In addition, Defendants, through their employee pharmacists and their policies, have violated Ca. Bus. & Pro. Code §733 which provides that pharmacists shall not obstruct a patient in obtaining a prescription drug or device that has been legally prescribed or ordered for that patient.

146.    Plaintiff and the Members of the California Subclass Members have suffered injury in fact and have lost money or property as a result of Defendants' violation of the UCL.

147.    Defendants' failure to abide by the laws discussed herein provide them an unfair advantage over their competitors at the expense of Plaintiff and the Members of the California Subclass.  The actions of Defendants thereby constitute an unfair, fraudulent, and/or unlawful business practice under Business & Professions Code §17200, *et seq.*

148.    Plaintiff and the Members of the California Subclass bring this cause of action seeking equitable and injunctive relief to stop Defendants' willful and ongoing misconduct, and to seek restitution of the amounts Defendants acquired through the unfair, unlawful, and fraudulent business practices described herein.  In addition, Plaintiff and the Members of the California Subclass seek an award of costs and attorneys' fees pursuant to California Code of Civil Procedure §1021.

## IX.

## <u>JURY DEMAND</u>

149.    Plaintiff and the Members of the National Class and the California Subclass request a jury trial on all issues triable by a jury.

## X.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiff, on behalf of herself and the Members of the National Class and the California Subclass, prays for:

1.    An Order certifying the Class proposed by Plaintiff, naming Plaintiff as Class representative of the National Class and the California Subclass, and appointing her counsel as Class counsel of the National Class and the California Subclass;

2.    A declaratory judgment that Defendants are in violation of the ADA, the ACA, the Rehabilitation Act of 1973, the Unruh Civil Rights Act and the California Unfair Competition Law;

3.    Injunctive relief as prayed for herein;

00899636-1

4.    An award of compensatory damages to Plaintiff and the Members of the National Class and the California Subclass in an amount determined by the jury that would fully compensate them for the injuries by Defendants' discriminatory conduct;

5.    An award of punitive damages to Plaintiff and the Members of the National Class and the California Subclass in an amount determined by the jury, but no less than three times the amount of actual damages, that would punish Defendants for the intentional, willful, wanton, and reckless discriminatory behavior;

6.    Statutory damages against Defendants for each violation of the Unruh Act;

7.    Restitution, civil penalties and damages as allowed under the Unfair Competition Law;

8.    Payment of costs of suit;

9.    Payment of reasonable attorneys' fees; and,

10.   All other relief to which Plaintiff, and the Members of the National Class and the California Subclass are justly entitled as a matter of law or equity.

Dated:          September 14, 2020          Respectfully submitted,


                                            LAW OFFICE OF THOMAS D. HAKLAR


                              By:     */s/ Thomas D. Haklar*
                                      Thomas D. Haklar
                                      State Bar No. 169039
                                      320 Encinitas Blvd., Suite A
                                      Encinitas, CA 92024
                                      Tel.: (858) 481-5454
                                      Fax: (858) 720-9797
                                      thaklar@haklarlaw.com

00899636-1