1  Thomas D. Haklar, CA Bar No. 169039
2  Peggy J. Reali (Of Counsel) SBN 153102
   **LAW OFFICE OF THOMAS D. HAKLAR**
3  320 Encinitas Blvd., Suite A
   Encinitas, CA 92024
4  Tel.: (858) 481-5454
   Fax: (858) 720-9797
5  thaklar@haklarlaw.com

6  Scott D. Hirsch (*Pro Hac Vice to be filed*)
7  **SCOTT HIRSCH LAW GROUP, PLLC**
   7301 W Palmetto Park Road #207A
8  Boca Raton, FL 33433
   Tel.: (561) 569-7062
9  scott@scotthirschlawgroup.com

10 Attorneys for Plaintiff and Others Similarly Situated
11 *[Additional Attorneys on next page]*

12              UNITED STATES DISTRICT COURT
13            NORTHERN DISTRICT OF CALIFORNIA
14

15 SUSAN SMITH, individually and on behalf of       Case No.: 3:20-cv-05451-CRB
   all others similarly situated,
16
17         Plaintiff,                               **THIRD AMENDED COMPLAINT**
                                                    **CLASS ACTION FOR**
18      vs.                                         **(1) Violations of Title III of the Americans**
                                                    **with Disabilities Act 42 U.S.C. §12182(a);**
19 WALGREENS BOOTS ALLIANCE, INC.,                  **(2) Violations of Section 504 of the**
   WAGDCO, LLC, WALGREENS CO., COSTCO              **Rehabilitation Act of 1973, 29 U.S.C. §794;**
20 WHOLESALE CORPORATION and DOES 1-10,            **(3) Violations of Section 1557 of the Patient**
                                                    **Protection and Affordable Care Act,42**
21                                                  **U.S.C. § 18116; and**
           Defendants                               **(4) Violations of Unruh Civil Rights Act, Cal.**
22                                                  **Civ. Code § 51, *et seq*., and**
23
24
25                                                  **DEMAND FOR JURY TRIAL**
26
27
28

01034110-1

Plaintiffs Third Amended Class Action Complaint - 1

Robert Redfearn (*Pro Hac Vice to be filed*)
Robert L. Redfearn, Jr. (*Pro Hac Vice to be filed*)
**SIMON, PERAGINE, SMITH & REDFEARN, LLP**
30th Floor, Energy Center
1100 Poydras Street
New Orleans, La.  70163-3000
Tel:  (504) 569-2030
Fax: (504) 569-2999
Robertr@spsr-law.com
Robertjr@spsr-law.com

Mark Kepple (*Pro Hac Vice to be filed*)
**BAILEY & WYANT, PLLC**
1219 Chapline Street.
Wheeling, W. Va.  26003
Tel.: (304) 233-3100
Fax: (304) 343-3133
mkepple@baileywyant.com

Joseph A. Bruno (*Pro Hac Vice to be filed*)
**BRUNO & BRUNO**
855 Baronne Street
New Orleans, Louisiana 70113
Tel.: (504) 525-1335
Fax: (504) 581-1493
jbruno@brunobrunolaw.com

Ted Huge (*Pro Hac Vice to be filed*)
**HARRIS & HUGE, LLC**
180 Spring Street
Charleston, SC 29403
Tel.: (843) 805-8031
Fax: (843) 636-3375
Ted@harrisandhuge.com

*Attorneys for Plaintiff*

## CLASS ACTION COMPLAINT

Plaintiff Susan Smith, by and through her undersigned counsel, brings this class action lawsuit for violations of the Americans with Disabilities Act ("ADA), 42 U.S.C. §12101, et seq., the Rehabilitation Act of 1973, 29 U.S.C. §701, et seq., the Affordable Care Act ("ACA"), 42 U.S.C. §18116, *et seq*. and the Unruh Civil Rights Act, Cal. Civ. Code §51, *et seq*. In support, Plaintiff alleges the following:

## I.

## INTRODUCTION

1.   This suit addresses the inability of Plaintiff Susan Smith, and those similarly situated, to get her legal and valid prescriptions for opioid medication filled as written by her long-time treating physician by the pharmacy defendants.

2.   The United States government, through the Food & Drug Administration ("FDA"), has recognized that opioid medication has risks but also great benefits for patients suffering from pain, which is why the FDA designated opioids as Schedule II drugs available only through prescriptions issued by prescribers registered with the Drug Enforcement Administration ("DEA"). The FDA continues to approve these drugs for use where medically appropriate, and when the FDA was requested in 2013, at a time when the opioid crisis was already full blown, to impose dose or duration limits, the FDA declined to do so, leaving such decisions instead to the healthcare practitioner in consultation with his or her patient.[1]

3.   Similarly, the California Legislature has approved, and continues to approve, the availability of opioid medications and has passed a Patient's Bill of Rights related to opioid medication treatment. The California Legislature made the following findings:

---

[1] *See* https://perma.cc/25ZF-SFBW.

The Legislature finds and declares all of the following:

(a) The state has a right and duty to control the illegal use of opiate drugs.

(b) Inadequate treatment of acute and chronic pain originating from cancer or noncancerous conditions is a significant health problem.

(c) For some patients, pain management is the single most important treatment a physician can provide.

(d) A patient suffering from severe chronic intractable pain should have access to proper treatment of his or her pain.

(e) Due to the complexity of their problems, many patients suffering from severe chronic intractable pain may require referral to a physician with expertise in the treatment of severe chronic intractable pain. In some cases, severe chronic intractable pain is best treated by a team of clinicians in order to address the associated physical, psychological, social, and vocational issues.

(f) In the hands of knowledgeable, ethical, and experienced pain management practitioners, opiates administered for severe acute pain and severe chronic intractable pain can be safe.

(g) Opiates can be an accepted treatment for patients in severe chronic intractable pain who have not obtained relief from any other means of treatment.

(h) A patient suffering from severe chronic intractable pain has the option to request or reject the use of any or all modalities to relieve his or her pain.

(i) A physician treating a patient who suffers from severe chronic intractable pain may prescribe a dosage deemed medically necessary to relieve pain as long as the prescribing is in conformance with Section 2241.5 of the Business and Professions Code.

(j) A patient who suffers from severe chronic intractable pain has the option to choose opiate medication for the treatment of the severe chronic intractable pain as long as the prescribing is in conformance with Section 2241.5 of the Business and Professions Code.

(k) The patient's physician may refuse to prescribe opiate medication for a patient who requests the treatment for severe chronic intractable pain. However, that physician shall inform the patient that there are physicians who treat severe chronic intractable pain with methods that include the use of opiates.

Cal. Health & Safety Code § 124960.

4.   The California Patient's Bill of Rights provides:

(a) A patient who suffers from severe chronic intractable pain has the option to request or reject the use of any or all modalities in order to relieve his or her pain.

(b) A patient who suffers from severe chronic intractable pain has the option to choose opiate medications to relieve that pain without first having to submit to an invasive medical procedure, which is defined as surgery, destruction of a nerve or other body tissue by manipulation, or the implantation of a drug delivery system or device, as long as the prescribing

01034110-1

CLASS ACTION COMPLAINT - 4

physician acts in conformance with the California Intractable Pain Treatment Act, Section 2241.5 of the Business and Professions Code .

(c) The patient's physician may refuse to prescribe opiate medication for the patient who requests a treatment for severe chronic intractable pain. However, that physician shall inform the patient that there are physicians who treat pain and whose methods include the use of opiates.

(d) A physician who uses opiate therapy to relieve severe chronic intractable pain may prescribe a dosage deemed medically necessary to relieve the patient's pain, as long as that prescribing is in conformance with Section 2241.5 of the Business and Professions Code .

(e) A patient may voluntarily request that his or her physician provide an identifying notice of the prescription for purposes of emergency treatment or law enforcement identification.

Cal. Health & Safety Code § 124961.

5.   Susan Smith is disabled within the meaning of the ADA. She is not disabled because she has pain due to age, routine medical or dental procedures or everyday aches and pain.  Her pain is not the same as what one might hear discussed by friends or family complaining about common ailments experienced by all people.  Susan Smith has severe Epilepsy, causing her to suffer severe and near constant migraines, Complex Partial Seizures and Grand Mal seizures.  The Epilepsy also caused Mesial Temporal Lobe Sclerosis of her brain for which she had to undergo brain surgery and may need further brain surgery.  In addition, she has had 6 surgeries to repair her knee, leg and ankle, following a car accident in which her lower leg was crushed, all of the bones in her right ankle were broken, her tibia and fibula had open compound fractures and she suffered a severe concussion.  She also suffers from an autoimmune disorder and has been diagnosed with numerous other medical conditions.  While she may not experience pain every minute of every day, it is constant, intractable, and debilitating.

6.   To treat the severe, high impact chronic and intractable pain resulting from her disabling conditions, Susan Smith's long time, duly licensed and DEA registered physician has prescribed certain opioid medication for her.  These prescriptions are not forged. She is not a drug seeker nor is she abusing or diverting her opioid medication.  Rather, she requires this medication to make it through each day and have some semblance of a normal life.   Nonetheless, unlike other people with

prescription medication, Susan Smith cannot be assured that her valid prescriptions will be filled as written by any retail pharmacy to which she brings them.

7.   Susan Smith is an innocent victim of the war on opioid abuse.  And she is not alone.  Most Americans are completely unaware of her plight and the plight of the many others like her.  Instead, they see and treat Susan, and millions of similarly situated disabled individuals suffering with high impact chronic pain, as nothing more than an addict; just like the Defendants are doing.

8.   Defendants Walgreens Boots Alliance, Inc. and Walgreens Co. (jointly "Walgreens") and Costco Wholesale Corporation ("Costco") own and operate numerous retail pharmacies throughout the United States.  They and various pharmaceutical manufacturers have been sued by numerous governmental agencies and victims of opioid abuse for irresponsibly promoting the use and dispensing of opioids for treatment of a broad variety of conditions, including mild and temporary pain, for which opioids were never intended.  Significantly, those suits do not allege that the defendants therein negligently or improperly promoted the use of opioids to the Class sought in this matter; that is those people with conditions for which the drugs were intended.

9.   To protect themselves from potential liability for these claims, each Defendant has adopted a nationwide corporate wide Policy for the dispensing of opioids by their pharmacists.  However, their respective policies, along with the related training and implementing procedures, go too far.  These policies restrict and/or deny meaningful access to opioid medication for patients with valid prescriptions for such medication for the legitimate medical treatment of their disabling conditions, the very patients for whom opioid medications are intended. Susan Smith and similar disabled individuals who require opioid pain medications as part of their monitored care are the new victims as the pharmacies and drug manufacturers try to absolve themselves for their alleged actions in

contributing to the opioid abuse crisis. Susan Smith and similar disabled individuals are the proverbial baby being thrown out with the bathwater.

10.     The Walgreens Opioid Dispensing Policy and the Costco Opioid Dispensing Policy each discriminate on the basis of disability. Each Policy not only treats patients with non-opioid prescriptions differently from other patients, but also imposes arbitrary dosage thresholds of 50-90 MME (Morphine Milligram Equivalent), and duration thresholds of 3-7 days, or some similar threshold, on some or all opioid prescriptions, such that patients with opioid prescriptions exceeding those thresholds are treated differently from patients with opioid prescriptions not exceeding those thresholds and from patients with non-opioid prescriptions.

11.     Patients with valid opioid prescriptions exceeding the dosage and duration thresholds are prescribed such medication because they suffer from conditions which render them disabled within the meaning of the ADA. Under the Walgreens and Costco Policies, when Susan Smith and other disabled persons present opioid prescriptions exceeding the arbitrary dosage and duration thresholds, their pharmacists are expected to either refuse to fill the prescription, only partially fill the prescription or impose some other requirement not imposed on other customers. These policies, along with the training and procedures implementing them, incentivize the pharmacists to not fill prescriptions exceeding these dosage and duration thresholds as written. The patients presenting such prescriptions, unlike other customers filling prescriptions at Walgreens and Costco, can never be sure whether their prescriptions will be filled or how they will be treated by the pharmacist and staff. They are "profiled" and have to dress certain ways, avoid paying in cash, if possible, avoid using convenient drive through options and take other such steps to improve the chance of their valid prescriptions being filled.

12.     Plaintiff does not object to Walgreens and Costco pharmacists ensuring that her prescriptions are not forgeries and have been issued by a DEA registered and duly licensed prescriber

for the amount and duration shown on the prescription for a legitimate medical purpose; that is not the issue that is before this Court.   Plaintiff objects to being profiled as a drug abuser based on the fact that she presents an opioid prescription exceeding a certain dose and duration.

13.    The initial, and primary, responsibility for issuing a valid prescription is with the treating physician.  Before prescribing opioids for any patient, the treating physician must conduct and document a complete medical history & physical examination of the patient.  The examination will include a review and analysis of the condition for which the treatment is sought and its cause, the nature and intensity of the patient's pain, current and past treatments for the condition and pain, underlying or coexisting diseases or conditions and a review of medical records and previous diagnostic studies.  The physician then develops a treatment plan and treatment goals, including curing, if possible, the underlying medical condition, decreasing pain and increasing function, improving pain-associated effects (e.g., sleeping issues, depression, anxiety, etc.), screen for treatment side effects, and avoiding unnecessary or excessive medication. The plan is evaluated and updated throughout the course of treatment so that it continues to be appropriate and realistic.

14.    When the prescription is then presented to a pharmacist, the pharmacist is to ensure that the prescription is not a forgery and was issued by a duly licensed and DEA registered prescriber. If the pharmacist has questions about the medical purpose of the prescription, the pharmacist is to consult with the prescriber to confirm the reason for the prescription and that it was intended to be issued to the person presenting the prescription for the drug, dose and duration stated in the prescription.  The pharmacist, however, may not substitute his opinion for the medical judgment of the doctor and re-diagnose the patient.

15. Once it is determined that the prescription is valid and issued for a legitimate medical purpose, the Walgreens and Costco Policies cannot refuse to fill the prescriptions as written.  But, in

fact, under their Policies, Walgreens and Costco pharmacists are not attempting to determine the validity of the prescription; they are seeking to avoid filling the prescriptions. Defendants *are* refusing to fill Susan Smith's prescriptions which are valid and for a legitimate medical purpose. As a result, Plaintiff and the class of similarly situated individuals she seeks to represent are suffering from these discriminatory practices.

## II.

## NATURE OF THE ACTION

16.     This is a putative class action brought pursuant to Fed. R. Civ. P. 23. It is brought by an individual on her own behalf and on behalf of all others similarly situated, against one of the country's largest pharmacy chains owned, operated and/or controlled by Walgreens Boots Alliance, Inc., Walgreens Co. and/or WAGDCO, LLC and also against Costco Wholesale Corporation.

17.     This class action seeks to recover from Defendants damages and injunctive relief for their corporate wide discriminatory policies, practices and procedures in refusing to fill, without a legitimate basis, valid prescriptions for the opioid medication of Plaintiff and the Members of the National Class and the California Subclass, who are protected individuals under federal law.

## III.

## THE PARTIES

18.     Plaintiff Susan Smith is an individual residing in Castro Valley, California.

19.     Defendant Walgreens Boots Alliance, Inc. ("WBA") is a Delaware corporation with its principal place of business in Illinois and is the parent company of Walgreens Co. WBA conducts or controls business through its various DEA registered subsidiaries and affiliated entities as a licensed wholesale distributor and operates retail stores, principally the Walgreens, Rite Aid and Duane Reade

pharmacy brands, throughout the United States in all 50 states that sell prescription medicines, including opioids.

20.     Defendant Walgreens Co. is an Illinois corporation with its principal place of business in Illinois, which conducts business as a licensed wholesale distributor and operates retail stores, throughout the United States in all 50 states that sell prescription medicines, including opioids.

21.     Defendant WAGDCO, LLC is a Delaware limited liability company with its principal place of business at 104 Wilmont Road, Deerfield, Illinois 60015. WAGDCO, LLC is a wholly owned subsidiary of Defendant WBA. WAGDCO, LLC provides services to Plaintiff and members of the Class through the Walgreens Prescription Savings Cub. The Walgreens Prescription Savings Club is represented to offer discounts on prescription drug prices in exchange for an annual fee.

22.     Defendant Costco Wholesale Corporation ("Costco") is a Washington corporation with its principal place of business at 999 Lake Dr., Issaquah, WA 98027-8990, doing business in California. Its agent for service of process is CT Corporation System, 818 W. Seventh Street, Suite 930, Los Angeles, Ca. 90017.

23.     The Walgreens Defendants are jointly referred to as "Walgreens" and the Walgreens Defendants and Costco are collectively referred to as "Defendants."

24.     Plaintiff is currently unaware of the true names and capacities of the defendants sued in this action by the fictitious names DOES 1 through 10, inclusive, and therefore sues those defendants by those fictitious names. Plaintiff will amend this complaint to allege the true names and capacities of such fictitiously named defendants when they are ascertained.

**IV.**

**JURISDICTION AND VENUE**

25.     This Court maintains jurisdiction over the parties to this action. Plaintiff is a citizen of the State of California. Additionally, the members of the Class are resident citizens of California as well as other states where Defendants conduct business. The Walgreens Defendants are citizens of the State of Illinois and are authorized and are doing business in the State of California. Costco is a citizen of the State of Washington doing business in the State of California.

26.     This Court has subject matter jurisdiction over this action. Federal question jurisdiction exists based on the assertion of claims for violations of the Americans with Disabilities Act, 42 U.S.C. §12101, et seq., the Rehabilitation Act of 1973, 29 U.S.C. §701, et seq., and the Affordable Care Act, 42 U.S.C. §18116, *et seq*.

27.     This Court also has jurisdiction over this matter pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1332(d). CAFA's requirements are satisfied in that (1) the members of the Class exceed 100; (2) the citizenship of at least one proposed Class member is different from that of the Defendants; and (3) the matter in controversy, after aggregating the claims of the proposed the Members of the National Class and the California Subclass, exceeds $5,000,000.00, exclusive of interest and costs.

28.     Additionally, this Court has jurisdiction pursuant to 28 U.S.C. §1343(a)(4) in that this action seeks to recover damages or to secure equitable relief under an Act of Congress providing for the protection of the Plaintiff's and the Class Members' civil rights.

29.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the Plaintiff's and California Subclass Members' pendent claims under the California Unruh Civil Rights Act (California Civil Code §§ 51, *et seq*.).

30.     Venue is proper in this District under 28 U.S.C. §1391.

01034110-1

## V.

## CLASS ACTION ALLEGATIONS

31.     Plaintiff brings this action on behalf of herself and all others similarly situated, pursuant to Rule 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, and is a member of, and seeks to represent, a National Class of persons defined as:

> All persons residing in the United States suffering from a disabling medical condition for which they were and are issued valid prescriptions for opioid medication exceeding 90 MME (Morphine Milligram Equivalent) and 7 days duration by a licensed medical provider as part of medical treatment during the period of March 15, 2016 through the present (collectively referred to as the "National Class").

Excluded from the Class are:

a.   The officers and directors of any of Defendants and their immediate family;

b.   Any judge or judicial personnel assigned to this case and their immediate family;

c.   Any legal representative, successor or assignee of any excluded person or entity.

32.     Plaintiff also seeks certification of the following California-wide Subclass (the "California Subclass") pursuant to Rule 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure :

> All persons residing in the state of California any time suffering from a disabling medical condition for which they were and are issued valid prescriptions for opioid medication exceeding 90 MME (Morphine Milligram Equivalent) and 7 days duration by a licensed medical provider as part of medical treatment during the period of March 15, 2016 (collectively referred to as the "California Subclass").

Excluded from the Class are:

a.   The officers and directors of any of Defendants and their immediate family;

b.   Any judge or judicial personnel assigned to this case and their immediate family;

c.   Any legal representative, successor or assignee of any excluded person or entity.

### Numerosity of the Class (Fed. R. Civ. P. 23(a)(1))

33.     The members of the National Class and the California Subclass are so numerous that joinder of all members is impracticable.   Plaintiff estimates the number of Members of both the

National Class and the California Subclass to be ten thousand or more similarly situated individuals nationwide.

34.     The Members of the National Class and the California Subclass are identifiable using methods of assessment and/or records maintained in the ordinary course of business by the Defendants or by other suitable methods.

35.     Notice may be provided to the Members of the National Class and the California Subclass by publication, and/or other means.

**Commonality (Fed. R. Civ. P. 23(a)(2))**

36.     Common questions of law and fact exist as to all Members of the National Class and the California Subclass and predominate over questions affecting individual Class Members of both Classes.  Among the questions of law and fact common to both Classes are:

a.  Whether Defendants improperly refused to fill the valid prescriptions of the Members of the National Class and the California Subclass for opioid medication;

b.  Whether Defendants implemented express and/or implicit state-wide and/or national policies regarding the filling of valid opioid prescriptions which misinterpret and/or misapply certain guidelines and laws;

c.  Whether Defendants implemented or created state-wide and/or national databases and/or used data analytical tools as an improper part of determining whether to fill the valid opioid prescriptions of the Members of the National Class and the California Subclass;

d.  Whether Defendants "profiled" persons presenting valid prescriptions for opioid pain medication on a state-wide and/or national basis;

e.  Whether Defendants' express and/or implicit policies regarding the filling of valid prescriptions for opioid medication interfere with the relationship of the Members of the National Class and the California Subclass with their physicians;

f.  Whether Defendants' express and/or implicit policies regarding the filling of valid prescriptions for opioid medication impose unnecessary requirements that increase the cost and expense to the Members of the National Class and the California Subclass;

g.  Whether Defendants' express and/or implicit policies, resulting in the refusal to fill the valid opioid prescriptions of the Members of the National Class and the California

Subclass violate the ADA, Section 504 of the Rehabilitation Act and/or the Anti-Discrimination provisions of the ACA.

37.     An additional question of law common to the California Subclass is:

a.   Whether Defendants' express and/or implicit policies, resulting in the refusal to fill the opioid prescriptions of the Members of the California Subclass violate the California Unruh Civil Rights Act, Ca. Civil Code §51, et seq.

38.     Defendants are expected to raise common defenses to these claims, including denying that their actions violated the law.

**Typicality (Fed. R. Civ. P. 23(a)(3))**

39.     The claims of the representative Plaintiff are typical of the claims of both the putative National Class and the California Subclass.  Furthermore, the factual bases of Defendants' misconduct are common to all Members of the National Class and the California Subclass and represent a common thread of misconduct resulting in injury to all members of both Classes.  Plaintiff has been damaged by the same wrongful conduct by Defendants and suffered injuries similar in kind and degree to the injuries suffered by the putative members of both Classes.  Plaintiff makes the same claims and seeks the same relief for herself and for all Class Members, including relief available to California residents under California law.

**Adequacy of Representation (Fed. R. Civ. P. 23(a)(4))**

40.     Plaintiff will fairly and adequately represent and protect the interests of both Classes. Plaintiff has retained counsel with substantial experience in prosecuting complex class actions. Neither Plaintiff nor her Counsel have interests adverse to those of either Class.

**Superiority of Class Action (Fed. R. Civ. P. 23(b)(2))**

41.     Absent class treatment, Plaintiff and the Members of the National Class and the California Subclass will continue to suffer harm as a result of Defendants' unlawful and wrongful conduct.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

Without a class action, individual Class Members would face burdensome litigation expenses, deterring them from bringing suit or adequately protecting their rights. Because of the ratio of the economic value of the individual Class Members' claims in comparison to the high litigation costs in complex cases such as this, few could likely seek their rightful legal recourse. Absent a class action, the Members of the National Class and the California Subclass will continue to incur harm without remedy.

42.     Nationwide class and Subclass certification of the claims is appropriate pursuant to Fed. R. Civ P. 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the National Class and the California Subclass, making appropriate both declaratory and injunctive relief with respect to Plaintiff and the National Class and the California Subclass as a whole.

**Superiority of Class Action (Fed. R. Civ. P. 23(b)(3))**

43.     Proceeding on a class wide basis for both the Nationwide Class and the California Subclass is a superior method for the fair and efficient adjudication of the controversy because class treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort, judicial resources, and expenses that individual actions would entail. Class treatment will allow the Members of the National Class and the California Subclass to seek redress for injuries that would not be practical to pursue individually because the damages suffered by the individual Members of the putative class is relatively small compared to the burden and expense of individual litigation of their claims against the Defendants. These benefits substantially outweigh any difficulties that could arise out of class treatment.

44.     Moreover, prosecuting separate actions by individual Class Members would create a risk of:

(A) inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for the Defendants; and/or

01034110-1

(B) adjudications with respect to individual Class Members that, as a practical matter, would be dispositive of the interests of the other Members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

45.    Plaintiff knows of no difficulty that will arise in the management of this litigation that would preclude its maintenance as a class action.

46.    Additionally, certification of the California Subclass is appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to class Members predominate over questions affecting only individual class Members.

47.    Finally, Defendants have acted, or refused to act, on grounds that apply generally to both Classes, so that final injunctive relief or corresponding declaratory relief is appropriate respecting each Class as a whole.

## VI.

## BACKGROUND

48.    Following publicity about a national problem with opioid abuse, numerous states, cities and municipalities filed lawsuits against manufacturers, wholesalers and dispensers of opioids alleging that aggressive and misleading marketing campaigns which began in the 1980s and 1990s created an "enormous untapped market" of patients with "everyday aches and pains" for opioid medication.[2] These suits, and enforcement actions by agencies, such as the Department of Justice and Drug Enforcement Agency, also alleged that various pharmacy defendants had inadequate policies and procedures in place to ensure that prescriptions they filled for opioids were valid prescriptions for legitimate medical purposes.

---

[2]    *See, e.g., City and County of San Francisco v. Purdue Pharma, L.P., et al*, No. 18-7591, U.S.D.C for the Northern District of California, Doc. 128, ¶201 & ¶¶ 191-544).

01034110-1

49.     In response, the pharmacy companies began an overbroad campaign to protect themselves against potential liability. To this end, pharmacy companies, including Defendants, swung the pendulum too far in the other direction and implemented policies, practices and procedures arbitrarily restricting access to opioid medication dispensed by their retail pharmacy outlets, even when presented with valid prescriptions. These policies go too far and are deliberately indifferent to the medical needs and rights of patients with appropriate and valid prescriptions for such medication. Many disabled innocent and legitimate patients have been denied access to necessary medication, arbitrarily profiled and treated as criminals and/or drug addicts and forced to incur unnecessary additional expenses to obtain opioid medication prescribed for legitimate medical needs as determined by their treating medical providers, all while suffering from debilitating pain.

50.     In 2010, the Centers for Disease Control ("CDC") began developing a guideline to provide "better clinician guidance on opioid prescribing" and on or about March 15, 2016 issued its Guideline for Prescribing Opioids for Chronic Pain (the "CDC Guideline" or "Guideline"). The CDC Guideline was intended as a "recommendation" for patients *starting* opioid therapy and specifically did not apply to cancer treatment, palliative care, and end-of-life care. Additionally, the Guideline was directed only to clinicians and not pharmacists, as the Guideline dealt with the scope of treatment for the underlying medical condition; something for which pharmacists have no training. Of particular relevance are recommendations 5 and 6, which provide:

> 5.  When opioids are started, clinicians should prescribe the lowest effective dosage. Clinicians should use caution when prescribing opioids at any dosage, should carefully reassess evidence of individual benefits and risks when considering increasing dosage to ≥50 morphine milligram equivalents (MME)/day, and should avoid increasing dosage to ≥90 MME/day or carefully justify a decision to titrate dosage to ≥90 MME/day.
>
> 6.  Long-term opioid use often begins with treatment of acute pain. When opioids are used for acute pain, clinicians should prescribe the lowest effective dose of immediate-release opioids and should prescribe no greater quantity than needed for the expected duration of

pain severe enough to require opioids. Three days or less will often be sufficient; more than seven days will rarely be needed.[3]

51.    Instead of understanding and developing policies that took into consideration the clear distinction the CDC was making for the benefit of physicians between acute and long-term pain, Defendants implemented policies and procedures that adopted and used the CDC Guideline dosage and duration thresholds as fixed limits and a means to refuse to fill legitimate opioid prescriptions as written.   The result is twofold: (1) Defendants are injecting themselves into the doctor-patient relationship and are now de facto practicing medicine, and (2) Susan Smith and similarly situated individuals of the Class are "profiled" and subjected to discriminatory practices which restrict their access to lawfully prescribed medication they need to survive.   The actions of the Defendants and other pharmacies, utilizing the guise of a legitimate gatekeeper function, is nothing more than pretextual discriminatory practices which have burdened the process of filling valid prescriptions for opioids to such an extreme that Susan Smith and other similarly situated disabled individuals are denied meaningful access to their rightful medical treatment.

52.    Seeing the unnecessary pain being thrust upon disabled individuals suffering from high impact chronic pain, the American Medical Association ("AMA") recognized that pharmacies were inappropriately using the CDC Guideline.   At its 2018 Annual Meeting, the AMA House of Delegates referred the following to its Board of Trustees:

> [T]hat our AMA actively continue to communicate and engage with the nation's largest pharmacy chains, pharmacy benefit managers, National Association of Insurance Commissioners, Federation of State Medical Boards, and National Association of Boards of Pharmacy in opposition to communications being sent to physicians that include a blanket proscription against filing prescriptions for opioids that exceed numerical thresholds without taking into account the diagnosis and previous response to treatment for a patient and any clinical nuances that would support such prescribing as falling within standards of good quality patient care.[4]

---

[3]    https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm.
[4]    https://www.ama-assn.org/system/files/2018-11/i18-refcomm-b-annotated.pdf, pp. 24-5.

53.    In 2019, the AMA Board of Trustees issued Report 22-A-19[5] in response, which provides in relevant part:

> Health insurance companies, national pharmacy chains and pharmacy benefit management companies (PBMs) all have - to varying degrees - implemented their own policies governing physician prescribing of controlled substances as well as patients' abilities to have a controlled substance prescription dispensed to them.   The result of this type of quasi-regulation is incredibly difficult to quantify on a large-scale basis due to the lack of transparency in the public sphere, but the AMA and many medical societies continue to receive concerns from physicians and patients as to the disruptive nature of health plan, pharmacy chain or PBM interference in the patient-physician relationship.

> *    *    *

> . . . [N]ational pharmacy chains, health insurance companies and PBMs have implemented their own restrictive opioid prescribing policies.  This report will not detail every iteration and difference between the policies except to say that most of the policies are some variation of the "CDC Guideline for Prescribing Opioids for Chronic Pain - United States, 2016" (the CDC Guideline).  In the CDC Guideline's introduction, CDC stated:

>> [T]he recommendations in the guideline are voluntary, rather than prescriptive standards. They are based on emerging evidence, including observational studies or randomized clinical trials with notable limitations. Clinicians should consider the circumstances and unique needs of each patient when providing care.

> Yet, the CDC Guideline goes on to make two recommendations that appear in nearly all the pharmacy, payer and PBM policies:

>> [Recommendation] 5.  When opioids are started, clinicians should prescribe the lowest effective dosage.  Clinicians should use caution when prescribing opioids at any dosage, should carefully reassess evidence of individual benefits and risks when considering increasing dosage to > 50 morphine milligram equivalents (MME)/day, and should avoid increasing dosage to > 90 MME/day or carefully justify a decision to titrate dosage to > 90 MME/day.

>> [Recommendation] 6.  Long-term opioids use often begins with treatment of acute pain.  When opioids are used for acute pain, clinicians should prescribe the lowest effective dose of immediate-release opioids and should prescribe no greater quantity than needed for the expected duration of pain

---

[5]    https://www.ama-assn.org/system/files/2019-08/a19-bot-reports.pdf, pp. 153-5.

severe enough to require opioids.  Three days or less will often be sufficient;
more than seven days will rarely be needed.

. . .  **It is important to note that CDC Guideline Recommendations 5 and 6 were
intended guidelines for acute pain episodes, not a hard threshold, and not intended for
chronic pain patients**.

\* \* \*

At the same time, multiple national pharmacy chains implemented some variation of the
CDC Guideline as their policy - a move the AMA warned would occur.

54.    In addition, most of the CDC Guideline is based on "type 4 evidence," which the CDC

defined as, "clinical experience and observations, observational studies with important limitations,

or randomized clinical trials with several major limitations."[6]  The improper implementation of the

CDC Guideline by the Defendants and other pharmacies is an overcorrection to a problem they are

alleged to have helped create and has been felt in every state.  The problem is so pronounced that in

one state, Alaska, the Board of Pharmacy sent a letter dated January 23, 2019 to all Pharmacists,

stating:

The Board of Pharmacy has had an influx of communication concerning patients not able
to get controlled substance prescriptions filled for various reasons, even when signs of
forgery or fraudulence were not presented.

As a result of the increased "refusals to fill," the board is issuing the following guidance
and reminders regarding the practice of pharmacy and dispensing of control substances:

1. Pharmacists must use reasonable knowledge, skill, and professional judgment when
   evaluating whether to fill a prescription.  Extreme caution should be used when
   deciding not to fill a prescription.  A patient who suddenly discontinues a chronic
   medication may experience negative health consequences;

2. Part of being a licensed healthcare professional is that you put the patient first.  This
   means that if a pharmacist has any concern regarding a prescription, they should
   attempt to have a professional conversation with the practitioner to resolve those
   concerns and not simply refuse the prescription.  Being a healthcare professional also
   means that you use your medication expertise during that dialogue in offering advice
   on potential alternatives, changes in the prescription strength, directions etc.  Simply
   refusing to fill a prescription without trying to resolve the concern may call into

---

[6]    https://www.cato.org/blog/lawmakers-really-want-follow-science-they-will-repeal-codified-opioid-guidelines.

01034110-1

question the knowledge, skill or judgment of the pharmacist and may be deemed unprofessional conduct;

3.  Controlled substance prescriptions are not a "bartering" mechanism. In other words, a pharmacist should not tell a patient that they have refused to fill a prescription and then explain that if they go to a pain specialist to get the same prescription then they will reconsider filling it. Again, this may call into question the knowledge, skill or judgment of the pharmacist;

4.  Yes, there is an opioid crisis. However, this should in no way alter our professional approach to treatment of patients in end-of-life or palliative care situations. Again, the fundamentals of using our professional judgment, skill and knowledge of treatments plays an integral role in who we are as professionals. Refusing to fill prescriptions for these patients without a solid medical reason may call into question whether the pharmacist is informed of current professional practice in the treatment of these medical cases.

55. If a prescription is refused, there should be sound professional reasons for doing so. Each patient is a unique medical case and should be treated independently as such. Making blanket decisions regarding dispensing of controlled substances may call into question the motivation of the pharmacist and how they are using their knowledge, skill or judgment to best serve the public. [7] In 2016, a Pain Management Best Practices Inter-Agency Task Force was established by the U.S. Department of Health and Human Services to address gaps or inconsistencies in managing chronic and acute pain. The 29-member Task Force included federal agency representatives as well as nonfederal experts and representatives from a broad group of stakeholders. On May 9, 2019, it issued its Report.[8] Its findings included the following:

The recent advent of retail pharmacies limiting the duration of prescriptions, making unrequested changes to dosages, or placing barriers to obtaining properly prescribed pain medications has had the unintended consequence of limiting access to optimal pain care. Without such access, many patients face significant medical complications, prolonged suffering, and increased risk of psychiatric conditions. (§3.4, pp. 62-3)

\* \* \*

Our report documented widespread misinterpretation of the CDC Guideline — specifically, the recommendation regarding the 90 morphine milligram equivalents (MME) dose. . . . Instances have been reported where the CDC Guideline was misapplied to the

---

[7]  https://www.commerce.alaska.gov/web/portals/5/pub/pha_ControlledSubstanceDispensing_2019.01.pdf.
[8]  https://www.hhs.gov/sites/default/files/pmtf-final-report-2019-05-23.pdf.

01034110-1

palliative care and cancer populations with pain and to providers who care for these patient populations. (§4, pp. 69)

\* \* \*

The CDC Guideline recommends that opioids prescribed for acute pain be limited to three or fewer days and that more than a seven-day supply is rarely necessary. Various health insurance plans, retail pharmacies, and local and state governments are implementing the CDC Guideline as policy, limiting the number of days a patient can receive prescription opioids even when the seriousness of the injury or surgery may require opioids for adequate pain management for a longer period. (§4, p. 70)

\* \* \*

For clarity, the CDC Guideline recommendation #6 refers to acute pain that is non-surgical, non-traumatic pain. (§4, p. 72)

56.    On April 24, 2019, the CDC issued a release addressing concerns about the misapplication of its Opioid Prescribing Guideline.[9] In the release, the CDC stated:

In a new commentary external icon in the *New England Journal of Medicine (NEJM)*, authors of the 2016 *CDC Guideline for Prescribing Opioids for Chronic Pain* (Guideline) advise against misapplication of the Guideline that can risk patient health and safety.

. . However, some policies and practices that cite the Guideline are inconsistent with, and go beyond, its recommendations. In the NEJM commentary, the authors outline examples of misapplication of the Guideline, and highlight advice from the Guideline that is sometimes overlooked but is critical for safe and effective implementation of the recommendations.

57.    A June 25, 2019, letter from the National Council on Independent Living written to Congress[10] warned:

The CDC guideline contains dosage guidance to assist doctors in starting a new opioid individual ranging from the equivalent of 50 to 90 milligrams of morphine a day. This recommendation is also based on low quality evidence (evidence quality 3).

Yet this dosage guidance has taken on a life of its own, becoming, as the CDC recently recognized, a sort of benchmark or proxy for safe prescribing. It has been translated as a de facto limit into pharmacy and payer policies and has been used to flag patients as over-utilizers and physicians as over-prescribers, without any consideration of the context of an individual's disease or the population of individuals a physician treats.

---

[9]  https://www.cdc.gov/media/releases/2019/s0424-advises-misapplication-guideline-prescribing-opioids.html.
[10]  https://www.ncil.org/wp-content/uploads/2019/06/6-25-19-Chronic-Pain-Sign-On-Letter.pdf.

As CDC Director Redfield recently clarified, this provision was never intended to apply to people currently taking opioids—as the implications of altering medication for current patients are quite different. For current patients, the Director makes clear, the only relevant question is whether the benefits exceed the risks of the medication.

The final report released by the Interagency Task Force also criticized the strict use of dosage thresholds as unscientific and potentially harmful. Nevertheless, these numbers are now used in risk scoring algorithms by payers, hospitals, pharmacies and law enforcement agencies, often in ways that are nontransparent. Higher-than-average dosage may automatically generate a "high-risk" score, even for individuals who have had years of successful long-term therapy and who exhibit no other risk factors and may lead to the abrupt and inappropriate denial of medication.

* * *

## OVERREACH TO UNINTENDED POPULATIONS

Another unintended consequence of misapplications of the guideline has been overreach to individuals who were never intended to be covered, such as people with cancer or sickle cell disease who were expressly exempt from the CDC guideline but have experienced serious barriers to receiving medication in the current policy environment. Similarly, some policies focused on acute pain have exempted people with chronic pain, but these exemptions too have proven insufficient to protect access to medication.

58.    On June 16, 2020, the AMA in response to a request by the CDC for comments on the CDC Guideline wrote[11] that many "misapply the CDC Guideline in different ways and have resulted in specific harm to patients," including the Walgreens' Good Faith Dispensing Policy.

59.    The AMA in its June 16, 2020 letter stated:

- Patients experiencing pain need to be treated as individuals, not according to one-size-fits-all algorithms and policies that do not take individual patient's needs into account. Yet, the CDC Guideline also included arbitrary dosage and quantity recommendations that have been consistently misapplied by state legislatures, national pharmacy chains, pharmacy benefit management companies, health insurance companies, and federal agencies. [12]

---

[11]    https://searchlf.ama-assn.org/undefined/documentDownload?uri=%2Funstructured%2Fbinary%2Fletter%2FLETTERS%2F2020-6-16-Letter-to-Dowell-re-Opioid-Rx-Guideline.pdf.

[12]    "The Task Force emphasizes the importance of individualized patient-centered care in the diagnosis and treatment of acute and chronic pain." U.S. Department of Health and Human Services (2019, May). Pain Management Best Practices inter-Agency Task Force Report: Updates, Gaps, Inconsistencies, and Recommendations. Retried from U.S. Department of Health and Human Services website: https://www.hhs.gov/ash/advisorycommittees/pain/reports/index.html.

01034110-1

CLASS ACTION COMPLAINT - 23

- The CDC has itself acknowledged the CDC Guideline's negative effect on access for patients with legitimate medical needs.

- A 2019 survey from the American Board of Pain Medicine found:[13]

  - 72 percent of pain medicine specialists said that they—or their patients—have been required to reduce the quantity or dose of medication they have prescribed.

- The AMA has heard from many physicians and patients from whom needed pain therapy with opioid analgesics was withheld based on a rationale that the treatment team was following the CDC guidance.

- Patients with sickle cell disease or advanced cancer have been accused of manufacturing acute pain and engaging in drug seeking behavior.

- Patients in hospice or who have cancer that opioid analgesics were denied because the prescribed amount did not comply with the CDC Guideline. These unintended but predictable consequences add to the stigma, racial, and other biases that these patients already face.

60.    The AMA concluded in its June 16, 2020, letter that:

- The Task Force further affirms that some recognize that patients with acute or chronic pain can benefit from taking prescription opioid analgesics at doses that may be greater than guidelines or thresholds put forward by federal agencies, health insurance plans, pharmacy chains, pharmacy benefit management companies, and other advisory or regulatory bodies.

- The CDC Guideline has harmed many patients[14]--so much so that in 2019, the CDC authors[15] and HHS issued long-overdue … clarifications that states should not use the CDC Guideline to implement an arbitrary threshold.

- Unfortunately, some policies and practices purportedly derived from the guideline have in fact been inconsistent with, and often go beyond, its recommendations. A consensus panel has highlighted these inconsistencies, which include inflexible application of recommended dosage and duration thresholds and policies that encourage hard limits and abrupt tapering of drug dosages, resulting in sudden opioid discontinuation or dismissal of patients from a physician's practice. The panel also noted the potential for misapplication of the recommendations to populations outside the scope of the guideline. Such misapplication has been reported for patients with pain associated with cancer, surgical procedures, or acute sickle cell crises. There have also been reports of misapplication of the guideline's dosage thresholds to opioid agonists for treatment of opioid use disorder.

[13]    Second Annual Survey of Pain Medicine Specialists Highlights Continued Plight of Patients with Pain, and Barriers to Providing Multidisciplinary, Non-Opioid Care. American Board of Pain Medicine. Available at http://abpm.org/uploads/files/abpm%20survey%202019-v3.pdf.

[14]    Beth D Darnall, David Juurlink, Robert D Kerns, Sean Mackey, et al., International Stakeholder Community of Pain Experts and Leaders Call for an Urgent Action on Forced Opioid Tapering, Pain Medicine, Volume 20, Issue 3, March 2019, Pages 429-433, https://doi.org.10.1093/pm/pny228.

[15]    Deborah Dowell, M.D., M.P.H., Tamara Haegerich, Ph.D., Roger Chou, M.D., No Shortcuts to Safer Opioid Prescribing. June 13, 2019. N Engl J Med 2019; 380:2285-2287. DOI: 10.1056/NEJMp1904190.

01034110-1

## VII.

## <u>WALGREENS</u>

61.    Walgreens Co. has adopted, implemented and oversees an Opioid Dispensing Policy to be followed by all pharmacists working at its retail pharmacy outlets in California and nationwide. WBA, as parent company to Walgreens Co., is responsible for setting, implementing and overseeing the Walgreens Co. Opioid Dispensing Policy. Walgreens refers to its Opioid Dispensing Policy as, or as part of, its "Good Faith Dispensing" Policy. Some opioids may be covered by a subset of the Good Faith Dispensing Policy referred to as the Target Good Faith Dispensing Policy. Neither Walgreens Co. nor WBA have publicly disclosed all details of the Walgreens Good Faith Dispensing Policy as it applies to opioids. Susan Smith has not received a copy of this policy. Discovery in this matter will bear out the true contents and details of this Policy.

62.    In 2013, Walgreens entered into a settlement with the Department of Justice pursuant to which it paid an $80 million fine for failing to prevent diversion of opioids. Upon information and belief, following the settlement, Walgreens amended its Good Faith Dispensing Policy specifically regarding opioids. Upon information and belief, the amended Policy included a "National Target Drug Good Faith Dispensing Checklist."

63.    Upon information and belief, in 2016, after the issuance of the CDC Guideline, Walgreens further amended its Opioid Dispensing Policy to incorporate the Guideline's 90 MME dosage and 7-day duration thresholds. Specifically, when patients present prescriptions for opioid medication exceeding both the CDC Guideline's 90 MME dosage and 7-day thresholds, Walgreens, through its Opioid Dispensing Policy, and related Practices, Procedures and Training, incentivizes, pressures and/or instructs, expressly or implicitly, its pharmacists to not fill such prescriptions and/or fill them at lesser amounts which do not exceed the CDC Guideline dose and duration thresholds,

treating those thresholds as hard and fast limits. Accordingly, Walgreens' pharmacists will obtain information about the patient's diagnosis, ICD codes, details of the patient's treatment plan, the expected length of treatment and whether previous medications were tried and failed in order to use this information to, in effect, "re-diagnose" the patient and his or her treatment and potentially "blacklist" individuals seeking to fill opioid prescriptions and/or their physicians prescribing the medication.

64.     Walgreens has made the decision to continue filling and selling opioid prescriptions. Although the Policy does not mean that prescriptions exceeding the CDC Guideline dosage and duration thresholds will never be filled, Walgreens, through its Opioid Dispensing Policy, Practices, Procedures and Training, actively discourages and burdens the process of filling valid prescriptions exceeding the Guideline dosage and duration thresholds. Upon information and belief, Walgreens' pharmacists are made aware through their managers and their training that by filling such prescriptions, the pharmacists are susceptible to being fired and risk being left on their own in any civil or criminal investigation relating to the filling of the prescription. In fact, Walgreens agreed to cooperate with the DEA in the investigation or prosecution of any Walgreens customer for the potential diversion of controlled substances, including making its employees available for interviews.

65.     Nationwide, following the issuance of the CDC Guideline in 2016, customers presenting opioid prescriptions exceeding the CDC Guideline dose and duration thresholds at Walgreens noticed difficulty and/or an inability in getting their prescriptions filled as written. The AMA passed resolutions and issued a letter noting that the CDC Guideline dose and duration thresholds was being applied improperly by pharmacies, specifically mentioning Walgreens and its Good Faith Dispensing policy. This was also noted by the Pain Management Task Force in its Pain

Management Best Practices Report. The CDC itself issued a press release specifically warning against the misuse of its Guideline.

66.     Walgreens acknowledges that all valid prescriptions should be filled, but the goal of its Policy is not to ensure the prescriptions are valid, but to protect Walgreens from potential liability for filling such prescriptions. Walgreens' Policy does this through the use of the CDC Guideline does and duration limits which, by its clear terms, are not meant to be applied by pharmacists nor applied to the prescriptions for patients such as Susan Smith.

67.     Walgreens pharmacists are not required to explain to the patients the true reason why their valid prescriptions are not being filled or why their valid prescriptions are being filled other than as written. Instead, they typically provide no explanation, offer a pretextual explanation, such as being out of stock, or seek to delay any action hoping the patient will go away on his or her own. These pretextual excuses are frequently intended to frustrate Plaintiff and provide cover to Walgreens from further regulatory scrutiny.

68.     In addition to the foregoing, upon information and belief, Walgreens has inadequately trained its pharmacists with regard to its Opioid Dispensing Policy, resulting in inconsistent application of the Policy, the profiling of patients presenting valid opioid prescriptions as criminals, drug seekers and addicts and its pharmacists either refusing to tell the patient why the valid prescriptions were not being filled as written or providing pretextual reasons, such as the drug being out of stock.

69.     In addition to the forgoing, Walgreens has marketed and sold its Prescription Savings Club to Plaintiff and the Members of the National Class and the California Subclass, representing that members of the Prescription Savings Club can save up to 80% off cash retail prices for prescriptions purchased from participating Walgreens pharmacies. To be a member of the Prescription Savings

Club, Walgreens charges an annual fee. Plaintiff and the Members of the National Class and the California Subclass are particularly drawn to join and use the Prescription Savings Club, as the cash price for opioid medication without insurance coverage is exorbitant. Upon information and belief, as of July 2020, Walgreens has removed some or all opioid prescription medications from use with the Prescription Savings Club. In the alternative, some individual pharmacists employed by Walgreens are refusing to honor the Prescription Savings Club discounts for prescription opioid medication.

70.     In practice and application, the Walgreens Opioid Dispensing Policy

a. Interferes with the physician-patient relationship between Plaintiff, and the Members of the National Class and the California Subclass, and their physicians, effectively engaging in the unauthorized practice of medicine;

b. Profiles and discriminates against Plaintiff, and the Members of the National Class and the California Subclass, through no fault of legitimate pain patients themselves or of the doctors caring for them; and

c. Ignores the real problems with opioid abuse and foists the responsibility for the epidemic on Plaintiff, and the Members of the National Class and the California Subclass.

71.     Plaintiff and the Members of the National Class and the California Subclass, who are afflicted with complex health conditions, already spend hours a week in doctors' offices and on the phone with insurers and billing departments, have limited access to transportation, and are already hindered by pain and fatigue. The delay and inconvenience in filling their legitimate opioid prescriptions present potentially serious health risks to Plaintiff and the Members of the National Class and the California Subclass.

72.     Walgreens is the second largest retail pharmacy chain in the United States, filing more than 1.2 billion prescriptions in 2019 in all 50 states, the District of Columbia, Puerto Rico, and the Virgin Islands and serving more than 8 million customers per day.[16] Walgreens's 2019 financial statement reflects total revenue of $136.9 billion, "Total Revenue Retail Pharmacy USA" of $104.5

---

[16]   https://news.walgreens.com/fact-sheets/frequently-asked-questions.htm.

billion and that 78% of the U.S. population lives within 5 miles of a Walgreens owned pharmacy. Walgreens owns and operates retail pharmacies under the Walgreens and Duane Reade trade manes. Walgreens's financial statement further states that it has (i) approximately 9,277 retail locations, (ii) approximately 88,000 healthcare service providers, and (iii) owns an approximate 27% stake in AmerisourceBergen – a company which supplies and distributes a significant amount of generic and branded pharmaceutical products to Walgreens owned pharmacies, including opiates.[17]  Foreclosing Walgreens' pharmacies to Plaintiff and the Members of the National Class and the California Subclass as possible sources for the filling of their opioid prescriptions dramatically increases the burden on them, denies them meaningful access to having their opioid prescriptions filled and denies them the same enjoyment of those pharmacies as other customers.

## VIII.

## COSTCO

73.     Costco has adopted, implemented, and oversees a Controlled Substance Dispensing Policy, which includes opioid medication, to be followed by all pharmacists working at its retail pharmacy outlets in California and nationwide.  Costco has not publicly disclosed the details of its Opioid Dispensing Policy.  Discovery in this matter will bear out the true contents and details of this Policy.

74.     Upon information and belief, in or around 2013, Costco amended and/or created its Policy regarding opioid dispensing.  Moreover, upon information and belief, in or around June 2016, after the issuance of the CDC Guideline, Costco further amended its Opioid Dispensing Policy to incorporate certain dose and duration thresholds similar and/or related to the Guideline's dosage and duration thresholds with a focus on seven "High Alert" medications consisting of (i) oxycodone, (ii)

---

[17]   https://s1.q4cdn.com/343380161/files/doc_financials/2019/annual/2019-Annual-Report-Final.pdf.

methadone, (iii) hydrocodone, (iv) hydromorphone, (v) meperidine, (vi) morphine, and (vii) oxymorphone.

75.    Under the amended Opioid Dispensing Policy, when patients present prescriptions for High Alert medication, particularly if it exceeds the dosing and duration thresholds, Costco, through its Opioid Dispensing Policy, and related Practices, Procedures and Training, incentivizes, pressures and/or instructs, expressly or implicitly, its pharmacists to not fill such prescriptions and/or fill them at lesser amounts which do not exceed the dosing and duration thresholds.  Accordingly, Costco pharmacists will obtain information about the patient's diagnosis, ICD codes, details of the patient's treatment plan, the expected length of treatment and whether previous medications were tried and failed in order to use this information to, in effect, "re-diagnose" the patient and his or her treatment and potentially "blacklist" individuals seeking to fill opioid prescriptions and/or their physicians prescribing the medication.

76.    Costco has made the decision to continue filling and selling opioid prescriptions. Although its Policy does not mean that prescriptions exceeding its dosing and duration thresholds or the CDC Guideline dosage and duration thresholds will never be filled, Costco, through its Opioid Dispensing Policy, Practices, Procedures and Training, actively discourages and burdens the process of filling prescriptions exceeding the Guideline dosage or duration thresholds.  Upon information and belief, Costco's pharmacists are made aware through their managers and their training that by filling such prescriptions, the pharmacists are susceptible to being fired and risk being left on their own in any civil or criminal investigation relating to the filling of the prescription.

77.    Costco acknowledges that all valid prescriptions should be filled, but the goal of its Policy is not to ensure the prescriptions are valid, but to protect Costco from potential liability for filling such prescriptions.

78.    Costco pharmacists are not required to explain to the patients the true reason why their valid prescriptions are not being filled or why their valid prescriptions are being filled other than as written. Instead, they typically provide no explanation, offer a pretextual explanation, such as being out of stock, or seek to delay any action hoping the patient will go away on his or her own. These pretextual excuses are frequently intended to frustrate Plaintiff and provide cover to Costco from further regulatory scrutiny.

79.    In addition to the foregoing, upon information and belief, Costco has inadequately trained its pharmacists with regard to its Opioid Dispensing Policy, resulting in inconsistent application of the Policy, profiling of patients presenting valid opioid prescriptions as criminals, drug seekers and addicts and its pharmacists either refusing to tell the patient why the valid prescriptions were not being filled as written or providing pretextual reasons, such as the drug being out of stock.

80.    In practice and application, the Costco Opioid Dispensing Policy

a. Interferes with the physician-patient relationship between Plaintiff, and the Members of the National Class and the California Subclass, and their physicians, effectively engaging in the unauthorized practice of medicine;

b. Stigmatizes and discriminates against Plaintiff, and the Members of the National Class and the California Subclass, through no fault of legitimate pain patients themselves or of the doctors caring for them; and

c. Ignores the real problems with opioid abuse and foists the responsibility for the epidemic on Plaintiff, and the Members of the National Class and the California Subclass.

81.    Plaintiff and the Members of the National Class and the California Subclass, who are afflicted with complex health conditions, already spend hours a week in doctors' offices and on the phone with insurers and billing departments, have limited access to transportation, and are already hindered by pain and fatigue. The delay and inconvenience in filling their legitimate opioid prescriptions present potentially serious health risks to Plaintiff and the Members of the National Class and the California Subclass.

82.    Costco operates a chain of membership warehouses with 101.8 million cardholding members and 548 warehouse locations in 45 states and Puerto Rico. It also operates pharmacies; however, customers are not required to be a Costco member to fill their prescriptions at Costco warehouses. Its total revenue for the fiscal year ending in September 2019 was $149.4 billion. In addition to its warehouses, Costco offers mail order prescription services. Foreclosing Costco's pharmacies to Plaintiff and the Members of the National Class and the California Subclass as possible sources for the filling of their opioid prescriptions dramatically increases the burden on them, denies them meaningful access to having their opioid prescriptions filled and denies them the same enjoyment of those pharmacies as other customers.

83.    Costco also offers a Costco Member Prescription Program which is a prescription drug discount card program that provides eligible Costco members and their eligible dependents with the ability to obtain lower prices on all medications with savings that range from 2% to 40% or more depending on the drug.[18] However, upon information and belief, the savings under this Program are not available to Plaintiff or the Members of the National Class and the California Subclass.

## IX.

## DEFENDANTS' APPLICATION OF THEIR POLICIES
## INTERFERES WITH THE DOCTOR-PATIENT RELATIONSHIP

84.    These Opioid Dispensing Policies, Practices and Procedures were not implemented by the Defendants for altruistic means. They were created in response to allegations that their own malfeasance was part of creating the very opioid crisis they claim they are fighting. These policies are not in place to protect society and the greater good or to ensure the validity of prescriptions. They have been created to protect Defendants' corporate self-interests. The result of Defendants' policies

---

[18]    https://www.costco.com/member-prescription-program-frequently-asked-questions.html.

01034110-1

is the denial of meaningful access to certain opioid medication for disabled persons with valid prescriptions who are profiled as drug abusers and interference with the doctor-patient relationship of those disabled persons, causing Defendants to engage in the practice of medicine without a license.

85.    Defendants hide behind the "corresponding duty" of a pharmacist under the Controlled Substances Act.  This duty requires the pharmacist to verify the prescriber and confirm that the prescriber is appropriately licensed to issue the prescription.   The pharmacist may also obtain information from the prescribe relating to the prescription, such as diagnosis codes/dates, prior authorization codes, and patient demographic information.  If the pharmacist has unresolved questions or concerns, the pharmacist should attempt to resolve those questions or concerns with the patient and/or the prescriber.  However, the pharmacist is not to "re-diagnose" the patient or make medical judgments second guessing the prescriber.

86.    Defendants have taken this "duty" too far and are using it as an excuse to not fill certain opioid prescriptions, in effect re-diagnosing patients in order to lower or prevent the sale of certain opioid prescriptions to patients, such as Susan Smith, who are presenting valid prescriptions, as defined in the Controlled Substances Act.  The discriminatory actions undertaken by Defendants, which they say is to "stem the abuse of these drugs and prevent death and injury," directly interfere with the doctor-patient relationship, acting to second guess the doctor and practice medicine without a license.

87.    Indeed, Walgreens has argued this exact point for years in multiple courts.   For example, in 2015 when faced with a wrongful death action for the filling of a prescription for a controlled substance, Walgreens argued that requiring a pharmacist to access a patients' prescription history through the Prescription Monitoring Program was against public policy and "would require a

pharmacist to 'second guess' a doctor's prescription, 'make medical judgments' and 'interject himself into the doctor-patient relationship.'" *See Hernandez v. Walgreen Co.,* ¶ 14, 49 N.E. 3d 453, 457.[19]

## X.

### SUSAN SMITH

88.     Susan Smith is a 44-year-old married mother with one son.  She is also one of almost 11 million U.S. adults suffering from High Impact Chronic Pain, that is, pain lasting 3 months or longer accompanied by at least one major activity restriction, such as being unable to work outside the home, go to school, or do household chores.[20]

<u>Susan Smith is Disabled</u>

89.     At the age of 17, Susan Smith was diagnosed with Epilepsy, a result of repeated head trauma from child abuse she had endured since the age of 4.  Mrs. Smith's intractable Epilepsy continued to worsen over time.  The Epilepsy causes her to suffer from migraines, Complex Partial Seizures and Grand Mal seizures.  The migraine headaches are near constant and can be so severe that at times she cannot walk, will lose her vision and will experience extreme bouts of nausea and vomiting.  The migraines can last for extended periods, including one that lasted as long as 25 days. She also has Complex Partial Seizures on an almost daily basis.  These seizures give her a tingling feeling with a taste of tin in her mouth and leave her lightheaded, dizzy, nauseous and tired.  These seizures can last up to 30 minutes.  The Grand Mal seizures are worse.  They can cause Mrs. Smith to lose consciousness for up to 30 minutes and result in her body becoming rigid and shaking.

---

[19]   Walgreens has similarly argued that "courts have held that the pharmacist is not privy to the doctor-patient relationship; has no particularized knowledge about the patient's medical history and proclivities; and that the pharmacist's duty is to fill prescriptions, not write them, or warn them about potential side effects."  *See Deed v. Walgreen Co.,* 2004 WL 2943271, *3 (Conn. Nov. 15, 2004).
[20]   https://www.nccih.nih.gov/research/research-results/prevalence-and-profile-of-high-impact-chronic-pain.

01034110-1

90.     In June 2010, while driving, Mrs. Smith suffered a seizure, causing an automobile accident in which the engine block went into and crushed her right leg, breaking all bones in her right ankle, causing an open compound fracture to her tibia and fibula, and a knee injury and giving her a severe concussion. She had surgery in which rods, pins and screws were inserted to repair her leg and ankle. She has had 6 surgeries to repair her knee, leg and ankle since 2010, with another surgery pending. In addition to opioids for pain, Mrs. Smith had several Cortisone injections in her knee and was prescribed Lidocaine patches, topical creams and physical therapy for her pain, all without success. She also developed chronic back pain as a result of the accident and surgeries. In 2011, the Social Security Administration found Mrs. Smith to be disabled as of June 25, 2010, the date of her car accident.

91.     In September 2010, Mrs. Smith's neurologist advised her that he could no longer treat her seizures given their severity and that she needed to be seen by an Epileptologist right away. At this point, her care was taken over by an Epileptologist and a Neurosurgeon. She was advised that she would need brain surgery to try to stop the Epilepsy seizures. In July 2011, after 6 months of testing which revealed that she had Mesial Temporal Lobe Sclerosis of her brain, Mrs. Smith was told that the damage to her brain from this extreme form of scar tissue was so severe that she likely had 3 months to live. In September 2011, Mrs. Smith had surgery to remove the scar tissue on her brain. The surgery did not cure her Epilepsy but did reduce its effects for a time. It also left her lethargic and intensified her migraine headaches. For Mrs. Smith, the nightmare of these migraines is never ending.

92.     In addition to migraines and seizures, Mrs. Smith suffers from Chronic Pain Syndrome, which causes pain in her joints. It is believed to result from an autoimmune disorder. She also has swelling in her feet and face, which, it has been suggested, may be due to a heart defect, though her

doctors are unable to determine the precise cause. She also suffers from chest pain and heart palpitations, the cause of which is unknown at this time.

93. Unfortunately for Mrs. Smith, traditional anti-seizure and migraine medications are not an option for her. Mrs. Smith has 16 documented medical allergies, including to Triptans, specifically, Sumatriptans, which are the class of medications developed to treat migraines. What this means for Mrs. Smith, and many other disabled individuals suffering from high impact pain as a result of their diseases, is that a non-opioid treatment regimen is medically inappropriate. Mrs. Smith's only viable option for treatment of her pain is prescription of opioids above the acute pain dosage and duration recommendations. Because of the Defendants' discriminatory practices as described herein, they are effectively and cruelly preventing Mrs. Smith from receiving the medical care she needs and causing her to suffer unnecessarily. Even the smallest interruption in the delivery of Mrs. Smith's medication can cause serious and dangerous risks to her overall health.

94. In sum, Mrs. Smith has been diagnosed with Mesial Temporal Lobe Sclerosis, Intractable Epilepsy w/Grand Mal Seizures, Partial Complex Seizures, Hypothyroidism/Graves Disease, Cyclical Vomiting Syndrome, Chronic Pain Syndrome, Chronic Fatigue, Peripheral Edema, Asthma, Osteoarthritis, Chronic Abdominal Pain, Degenerative Disc Disease throughout her back, Generalized Anxiety Disorder secondary to medical condition, Chronic Migraine and Mood Disorder secondary to medical condition.

95. As a result of her conditions, Mrs. Smith is restricted in her ability to drive and has difficulty lifting, squatting, bending, standing, walking, sitting, kneeling, climbing stairs, processing information, concentrating and focusing. She is unable to handle household chores, such as cleaning, laundry, minor repairs, taking care of the yard, on her own on a regular basis and needs assistance getting dressed and bathing. She is unable to sit or stand for long periods. Since 2014, she has used

crutches and/or a walker for assistance when the pain from her headaches or knees and feet is severe or when she is unstable due to seizures, migraines or dizziness. She no longer does any cooking requiring the use of a stove. The pain from her migraines can give her insomnia and there are times when she has spent 5 days without sleep. She goes outside of her house maybe 1 or 2 times a month and does not go alone unless absolutely necessary. Her only regular outside activities are her monthly doctor appointments. She takes medicine which causes her to be sleepy and can cause numbness in her hands and feet. Most days, Mrs. Smith is so sick she cannot shower or get dressed.

96.     The only medications Mrs. Smith can take to provide her with any sort of relief from the extreme pain are opioids. Accordingly, Mrs. Smith has been prescribed Morphine since 2011 and has taken the same dose, prescribed by the same physician, a NeuroPsychiatrist specializing in traumatic brain injury and pain management, since 2012.[21]

### Difficulties Fulfilling Her Opioid Prescriptions

97.     Since 2012, Susan Smith has been seen by her treating NeuroPsychiatrist generally once a month. As part of his treatment for her conditions, and the pain resulting from those conditions, he typically gives her a 30-day prescription for her opioid medication.

98.     Getting her prescription filled has become an ordeal for Susan Smith. Every month is a game of Russian roulette. Unlike other customers, she cannot go to the pharmacy when and where it is most convenient for her. Instead, she has to plan her schedule around picking up her prescription medication and begins planning a few days before her then current prescription opioid medication runs out. She usually has to pick the prescription up in person, which requires help from her husband. She can't use a drive through pickup lane but must go inside the store. She is aware that she is being

---

[21]   Mrs. Smith was initially prescribed the Vicodin in 2008 for her migraines after discovering her allergy to Triptans. After her automobile accident, her physician switched her to morphine due to her increased pain.

"profiled" by the pharmacists. She has to make sure neither she nor her husband dress in a manner or wear certain clothes that might make them appear "suspicious" to the pharmacist and avoid paying cash if possible. She is never sure whether the pharmacies will fill her prescription one day before her then current prescription opioid medication runs out or the day after. She has to expect questions about her prescription and an unwillingness on the part of the pharmacist to tell her the truth about whether her prescription will or can be filled, but she must be careful not to come across as argumentative regardless of how much pain she might be in at the time. She has to be prepared to travel to numerous different pharmacies and her attempts to fill her prescription frequently becomes an all-day affair. She has to be prepared with some kind of plan in the event she cannot get her prescription even partially filled. All of the foregoing causes her great anxiety and anguish as the end of each month approaches.

99.     The process of trying to get her valid prescription filled has become so burdensome as to discriminate against Susan Smith solely on the basis of her disability and to deny Susan Smith meaningful access to her opioid prescription medication.

### Walgreens

100.     Susan Smith lives in Castro Valley, California. There is a Walgreens pharmacy in Castro Valley within 1 mile of her home. Initially, she was able to get her opioid prescriptions filled at the Castro Valley Walgreens. The pharmacist at that Walgreens pharmacy was given medical information about her condition and her need for the opioid medication. This information was kept in a binder at the store.

101.     Around 2016 or 2017, the pharmacist at the Castro Valley Walgreens refused to fill Susan Smith's prescriptions anymore, referring to the new CDC Guideline and telling her that her MMEs were too high per the Guideline. This is clear and unequivocal evidence and an admission that

Walgreens had adopted the CDC Guideline dose and duration thresholds as a hard and fast limit under of its Good Faith Dispensing policy.

102.    The pharmacist suggested she try a 24-hour Walgreens store or one near a hospital. Susan Smith located a 24-hour Walgreens in Fremont, California, close to the Washington Health System Hospital. The Fremont pharmacy is approximately 14 miles from her home. In traffic, it can take her up to 2 hours to make the trip to the pharmacy.

103.    When she first went to the Fremont Walgreens, Ms. Smith explained her situation to the pharmacy manager. He said he understood her situation and filled her prescription. Mrs. Smith believed she would be able to continue filling her prescription at the Fremont pharmacy; however, the next month, the pharmacy manager acted as though he had never seen or met her and refused to fill her prescription.

104.    On another occasion, Mrs. Smith was told by a Walgreens' pharmacist to go to the Walgreens in Danville. When she arrived after making the 13-mile drive, the pharmacist at that store told her he wouldn't fill her prescription which exceeded the CDC Guideline dose and duration thresholds since she didn't live in the area, and she needed to "go back to her side of the hill." The "National Target Drug Good Faith Dispensing Checklist" includes whether the patient's address is "within geographical proximity to the pharmacy; variances can be explained." Thus, on the surface, the pharmacist appeared to be following Walgreens' national Policy in refusing to fill Plaintiff's prescription; however, he made no attempt to determine whether there was a reason why she came to that particular pharmacy and he undertook no review or investigation of Plaintiff's prescription to determine whether it was legitimate. Thus, he was not performing any diligence on the prescription but simply refusing it as part of the Walgreens Policy to avoid filling such prescriptions as written.

105.    On another occasion, Mrs. Smith went to the Walgreens pharmacy and was told that her medication – which exceeded the CDC Guideline dose and duration thresholds - had to be ordered and it would take 3 days.  When she said she would wait the 3 days, the pharmacist then told her it would take 1-2 weeks.  There is no reason for this abrupt change except that the pharmacist was hoping that Plaintiff would simply leave without filling her prescription.

106.    On another occasion, Plaintiff went to the Castro Valley Walgreens pharmacy.  The pharmacist on duty told Mrs. Smith that her doctor would need to fill out 5 detailed medical forms describing her medical and treatment history.  Mrs. Smith called her physician while at the pharmacy and he completed and faxed back the medical forms.   Several hours later when Mrs. Smith returned to the Walgreens pharmacy to pick up her prescription, despite having received the 5 pages of medical forms from her physician, the pharmacist still refused to fill Mrs. Smith's prescription, claiming her doctor had misspelled morphine as "morphene" and that the notation "IR" (immediate release) could be either CR or ER.  Mrs. Smith's husband had the pharmacist pull prescriptions from her doctor over the prior 12 months to prove that it was the doctor's handwriting and not an error or forgery.  The pharmacist then claimed it was too early to refill the prescription and Mrs. Smith would have to wait until the next day.  Mrs. Smith pulled out the receipt showing the date when she picked up the medication the prior month which established that she was not early, but the pharmacist nonetheless refused to fill the prescription.  It is clear that the pharmacist was not exercising professional due diligence to ensure the prescription was legitimate.  Plaintiff addressed and satisfied the "concerns" raised by the pharmacist, who nonetheless refused to fill the prescription exceeding the CDC Guideline dose and duration thresholds.  This is evidence that the "concerns" raised by the pharmacist were pretextual reasons given to avoid filling the prescription.

01034110-1

107.    In a particularly egregious incident, Mrs. Smith went to the Fremont pharmacy where a pharmacist and a pharmacy tech took her prescription to the back and loudly laughed and made fun of her. They both came back to the counter and said they didn't have the full 120 pills but offered to fill the script for just 4 ½ days. The pharmacist then insisted on seeing Mrs. Smith's current medication bottle. There were two pills left (1 dose) and he said she would have to wait until after midnight for the prescription. Mrs. Smith explained that it was an inconvenience for her to drive back to Fremont in the morning to pick it up when she had already gone out of the way to fill it. He told her she could take his offer or try somewhere else. Having no choice, Mrs. Smith said she would take the 4 ½ days' worth of pills. The pharmacist made her wait over two hours. At one point, she got up to ask the pharmacist a question and the tech walked back to him and whispered: "That lady wants to talk to you." He responded: "Tell the fucking bitch I'm filling her prescription." Mrs. Smith walked away and waited until midnight. The entire time she waited the pharmacist and pharmacy tech snickered and made jokes about her, questioned the ICD codes, and made comments about why any person would need morphine for migraines. Finally, at midnight, Mrs. Smith went up to the counter to ask if she could pick up the prescription yet. The pharmacist came over and said the entire prescription had been filled, less the two pills she still had. Mrs. Smith commented that she thought they didn't have enough to give her 30 days of pills and he replied he "just happened" to find enough in the back. It seems clear the pharmacist was not telling the truth about only having a 4 ½ day supply of Plaintiff's medication but was hoping to discourage Plaintiff from seeking to have her prescription filled. In addition, making Plaintiff needlessly wait for over two hours, until after midnight, is evidence that the pharmacist was simply hoping Mrs. Smith would leave without getting the prescription filled.

108.    Mrs. Smith contacted Walgreens corporate to complain about the incident. Without authorization, the Walgreens employee told Mrs. Smith he was "looking at her prescription history."

After his review of her prescription history, Mrs. Smith detected a change in the employee's demeanor. He immediately became dismissive of her plight, telling her "we filled it last month, so what?" After learning that Mrs. Smith is a high impact chronic pain patient and has a prescription for opioids to treat that chronic pain, the Walgreens employee acted as if Mrs. Smith was a nuisance or a drug addict. It was obvious that Walgreens profiled customers, such as Plaintiff, with prescriptions for opioid medication exceeding CDC Guideline dose and duration thresholds.

109.    In 2017, after just having had orthopedic surgery, the orthopedic physician prescribed her additional pain medications due to her severe medical allergies and pre-existing chronic pain condition.  The physician told Mrs. Smith to tell the pharmacist to call him so he could explain her medical condition and the reason for the prescription.  Rather than pick up the phone and contact her physician as Mrs. Smith was instructed and had requested, the Walgreens pharmacist just flatly refused to call or fill the prescription; telling Mrs. Smith "maybe you should try rehab instead of pain meds." Again, the pharmacist was not exercising professional due diligence to determine if the prescription was legitimate but simply refusing it as part of the Walgreens Policy to avoid filling such prescriptions as written.

110.    On another occasion while using the drive thru drop off/pick up at Walgreens, the pharmacist said Walgreens had her medication in stock and then proceeded to ask if she would like to fill a prescription for Narcan at the same time.  Mrs. Smith had no idea what Narcan was and declined. Because Mrs. Smith declined the Narcan, the pharmacist gave the prescription back refusing to fill it and walked away from the window so Mrs. Smith could not question her any further.  The pharmacist made no attempt to explain why she asked Plaintiff about Narcan or why Plaintiff's refusal was a basis to not fill her prescription.  It is clear the pharmacist was not exercising professional due diligence or

seeking to resolve open questions to determine if the prescription was legitimate but was simply refusing to fill a legitimate prescription.

111.    None of the foregoing instances evidence attempts at due diligence or the exercise of professional judgment to determine if Plaintiff's prescriptions for an opioid exceeding the CDC Guideline dose and duration thresholds were legitimate. In those instances, either Plaintiff provided the information required to answer supposedly unresolved questions or the pharmacists made no attempt to obtain information to answer the supposedly unresolved questions about the prescriptions. Or, excuses about lack of supply proved to be untrue when Plaintiff agreed to wait or agreed to take a lesser amount rather than simply give up on having her prescription filled.

112.    The fact that Plaintiff was able to get her prescriptions filled evidences that they were legitimate and she should have been able to get them filled at any Walgreens pharmacy. The fact that Walgreens' pharmacists instead bounced her around to different locations evidences that they were simply trying to avoid being the pharmacist to fill her prescriptions.

113.    The traveling around to different pharmacy locations is common among patients with opioid prescriptions exceeding the CDC Guideline dose and duration thresholds and is referred to as the "Pharmacy Crawl." In addition to the Fremont Walgreens, Mrs. Smith has traveled to the Walnut Creek Walgreens, which is 15 miles from her house, and the Brentwood Walgreens, which is 26 miles from her home to try to fill her prescriptions. With traffic, it can take her more than an hour to get to these pharmacies. She has also gone to the San Leandro Walgreens, which is approximately 4 miles from her home, but in a very rough neighborhood. On one occasion, the store was robbed minutes before she entered. She has also been present in that store when there was looting and rioting going on.

114.    The foregoing are not isolated incidents.  Each month, Mrs. Smith is profiled and treated as an "addict" and must plan for several days for the monthly filling of her prescription.  The individual Walgreens pharmacists are aware that filling a prescription exceeding the CDC Guideline dose and duration thresholds, such as Plaintiff's, will be noted by their managers and higher up corporate officers and subject them to the risk of termination, other discipline and/or being abandoned in the event of a claim that the prescription should not have been filled.  Accordingly, they would rather the prescription be filled by some other pharmacist, so they take steps to avoid having to fill the prescription by imposing obstacles that others whose prescription are not for opioids exceeding the CDC Guideline dose and duration thresholds do not face.

115.    In addition to the foregoing, several years ago, after realizing that many insurance companies would not cover the cost of her opioid prescription, Mrs. Smith learned about and joined the Walgreens Prescription Saving Club.  Walgreens markets this club not as insurance but as a savings club for prescription medications.

116.    To signup, Mrs. Smith had to pay a $25 yearly fee.  Walgreens represented that Mrs. Smith would save up to 80% on her prescriptions, and for a while she in fact did.  For example, normally her morphine prescription without subsidies costs $400.  With the Prescription Savings Club, Mrs. Smith's prescription cost her only $60.  Without notice or reason, Mrs. Smith was refused the discount on her morphine prescription in July 2020 and was told that as of July 2020, Walgreens would no longer accept and apply the Prescription Savings Club discount to her prescription.  In August 2020, Walgreens did apply the discount, but then in the past couple of months, Mrs. Smith has been told that the discount would not apply to her medication, leaving her uncertain as to the applicability of the discount in the future.

117.    Month after month, year after year, Mrs. Smith has been subjected to the above-described harassment and discrimination by Walgreens for no reason other than the fact that she has high impact chronic pain and is prescribed opioids to treat it.  Mrs. Smith frequently travels to two to four different Walgreens pharmacies a month to try to get her prescription filled, none of which are close by or convenient to her home.  Sometimes, she is denied by being simply told the prescription cannot be filled because she does not live in that neighborhood.  Other times her prescription is refused on the basis that insurance will not cover the full amount for what she is prescribed, notwithstanding the fact that she offers to pay cash in that instance.

118.    Walgreens's discriminatory actions and harassment have subjected Mrs. Smith to unnecessary stress.  Every month she has to endure the anxiety of what excuse or beratement she will have to go through to try to get her prescription filled.  Every month she has to check the calendar to make sure the date is correct; to make sure she is in town when her prescription comes due; and has to count each pill to make sure the count is spot on, as Walgreens has made her to feel like a pariah, even demanding that she bring in her pills to prove how many she has left.

119.    Walgreens has acted intentionally and with deliberate indifference to the strong likelihood that a violation of federally protected rights would result from the implementation of their foregoing policies, practices and procedures.  Walgreens knew that harm to Mrs. Smith's federally protected right was substantially likely and failed to act on that likelihood.

120.    Mrs. Smith has suffered compensatory damages due to Walgreens' intentional discrimination and deliberate indifference.  Since at least 2017, at least once a month, she and her husband have to spend hours driving around looking for a Walgreens pharmacy that will fill her prescriptions for opioid medication despite the fact that there is a Walgreens pharmacy close to her home.  In addition to the pain-and-suffering she experiences in having to undertake these trips and her

mental anguish and fear wondering where and whether she will be able to get her prescriptions for opioid medication filled, Walgreens' actions have caused her to incur unnecessary increased expense for gas and unnecessary wear and tear of her car.

121.    If Walgreens ended its discrimination, Mrs. Smith would definitely seek to have her prescriptions for opioid medication filled at Walgreens.

Costco

122.    Similarly, Mrs. Smith has had her prescriptions for opioid medication rejected without explanation by Costco.  There are Costco warehouses located in Danville and Livermore, Ca. near her home, although at a distance.  At one of the warehouses, Ms. Smith presented her prescription for opioid medication and the pharmacist simply looked at it and gave it back to her without explanation.  Her husband, who was with her, pleaded with the pharmacist to fill the prescription, but was flatly told "no" with no explanation whatsoever.  The pharmacist asked no questions of her, did not check the computer and did not even attempt to contact her doctor about the prescription.

123.    On another occasion, at the other warehouse, Mrs. Smith presented her prescription, but the pharmacist refused to fill it.  Ms. Smith tried talking to the pharmacy manager, but the manager told her that Costco did not sell her medication, then walked away leaving her prescription on the counter.  The distinct impression given by the pharmacist was that Costco had a policy against selling her medication and would never have such medication in stock in any amount.  Upon information and belief, that is not true but was said to discourage Plaintiff from trying to fill her prescription at Costco.  The pharmacist made no review of Costco's system to determine if the medication was in stock and no attempt to verify the legitimacy of Plaintiff's prescription by questions to Plaintiff or her physician nor perform any other due diligence.  Upon information and belief, the reason given was pretextual.

124.    On another occasion, Mrs. Smith tried to fill her prescription at the Danville store. She handed the prescription and her ID to the woman behind the counter who then asked for her Costco card. Costco cards are typically checked upon entry to the store, so it seemed unusual that the pharmacy would ask to see the card. In addition, Costco allows non-members to fill prescriptions, so there was no reason for this request. Mrs. Smith, who is a Costco member, told the woman she didn't have her card with her, but that her mother, who was with her and was also a member, did have her card. Mrs. Smith's mother then pulled out her Costco card. The woman replied that the card had to be Mrs. Smith's own personal card with her picture, despite the fact that Plaintiff had already provided an ID with her picture. The woman made no effort to check whether Ms. Smith was in fact a Costco member. Ms. Smith considered going home to get her Costco card and making the drive back to fill her prescription, but because she didn't have the physical card, the woman would not even tell her if the medication was in stock. Upon information and belief, the reason given for the refusal was pretextual.

125.    Mrs. Smith has also tried to fill her prescription at the Costco in Concord because it is near her doctor's office but was unsuccessful.

126.    In these encounters, the Costco pharmacists never specifically mentioned dose and duration thresholds because they never engaged in any meaningful discussion with Plaintiff about her prescription. They simply looked at her prescription and rejected the prescription with no explanation. Plaintiff did not witness any of them make any further attempt to verify the legitimacy of her prescription.

127.    Mrs. Smith and/or her family members continue to shop for other items weekly at the Costco warehouses located in Danville and Livermore, Ca. Given the flat rejection of her prescriptions for opioid medication, Mrs. Smith considers it futile to seek to have her prescriptions filled at Costco.

01034110-1

128.    Costco acted intentionally and with deliberate indifference to the strong likelihood that a violation of federally protected rights would result from the implementation of their foregoing policies, practices and procedures.  Costco knew that harm to Mrs. Smith's federally protected right was substantially likely and failed to act on that likelihood.  Costco's discriminatory actions and harassment have subjected Mrs. Smith to unnecessary stress, emotional distress and mental anguish.  However, if Costco ended its discrimination, Mrs. Smith would definitely also seek to have her prescriptions for opioid medication filled at Costco as well as Walgreens.

129.    As a direct and proximate result of both Defendants' delays and refusals of Mrs. Smith's prescription opioids, Mrs. Smith has/will suffer(red) debilitating pain and neurological compromise that is searing, disabling and medically dangerous.

## XI.

## THE WALGREENS AND COSTCO POLICIES AT ISSUE APPLY EXCLUSIVELY OR DISPROPORTIONATELY TO DISABLED PERSONS

130.    The Walgreens and Costco policies at issue apply to opioid prescriptions exceeding 90 MME and lasting for more than 7 days.  Opioid prescriptions exceeding these or similar dose and duration thresholds are given to treat severe pain resulting from disabling medical conditions.

131.    Before a physician, or any prescriber, can issue a prescription for controlled substances, such as opioids, the physician must register as a controlled substance provider.  Before prescribing opioids for any patient, the treating physician must conduct and document a complete medical history & physical examination of the patient.  The examination will include a review and analysis of the condition for which  the treatment is sought and its cause, the nature and intensity of the patient's pain, current and past treatments for the condition and pain, underlying or coexisting diseases or conditions and a review of medical records and previous diagnostic studies.

132.    The physician then develops a treatment plan and treatment goals, including curing, if possible, the underlying medical condition, decreasing pain and increasing function, improving pain-associated effects (e.g., sleeping issues, depression, anxiety, etc.), screen for treatment side effects, and avoiding unnecessary or excessive medication.   The plan is evaluated and updated throughout the course of treatment so that it continues to be appropriate and realistic.  If opioids are determined to be appropriate, the physician will great an informed consent from the patient.

133.    Typically, physicians will not, and in some states may not, issue opioid prescriptions for more than 7 days for conditions causing "acute" pain.  "Acute pain" is generally considered to be pain lasting for a short period of time, usually 4 weeks or less.  It has been defined as the "normal, predicted, physiological, and time-limited response to an adverse chemical, thermal, or mechanical stimulus associated with surgery, trauma, or acute illness."[22]

134.    Thus, prescriptions for opioids exceeding 7 days are not issued unless there is intractable pain or conditions resulting in pain lasting.  The more disabling the pain and/or condition, the greater the dose which will be prescribed.

135.    An April 2021 Economic Research Report prepared by or for the U.S. Department of Agriculture notes that "Epidemiological survey research has also found a close link between pain and physical disability" and that "physical disability is strongly linked to chronic disease."   The study further states that: **"The tie between physical disability and opioid prescriptions is remarkably strong**."[23]

---

[22]    *See* Carr DB, Goudas LC. Acute pain. *Lancet*. 1999;353(9169):2051-2058; Fl. Stat §456.44; Mich. Stat §333.7333b; Me. Stat. §22:7246; N.D. Stat. §19-03.3-01; Tx. Health & Safety Code §481.07636; N.M. Stat. §24-2D-2.
[23]    The Opioid Epidemic: A Geography In Two Phases, pp. 6 & 7.
https://www.ers.usda.gov/webdocs/publications/100833/err-287.pdf?v=1708)

136.    A March 2021 study by the University of Michigan notes that "preliminary research has suggested a link between opioid prescriptions and disability program participation."  The study states:

> *There is the potential for a strong relationship between prescription opioid use and disability status* as determined by Social Security through SSDI or SSI since the conditions that tend to require prescription opioids (chronic pain, musculoskeletal injuries or mental health conditions) also tend to be qualifying conditions for Social Security-administered disability programs.  Both SSDI and SSI require that alleged disabling health conditions last for at least 12 months or be expected to result in death, and prevent the applicant from earning at the substantial gainful activity level ($1,310 per month for nonblind applicants in 2021) (emphasis added).[24]

137.    Another 2021 study found: "Our data show that individuals with disabilities who use opioids, on average, have a higher incidence of continuous opioid use and significantly greater amounts prescribed compared to other adults who have opioid prescriptions."[25]

138.    In a Technical Assistance Document issued on August 5, 2020, the EEOC advised:

> *If the patient's pain requires ongoing opioid medication, the underlying medical condition likely qualifies as an ADA disability*.  The ADA's definition of "disability" is different from the one used for Social Security disability benefits – having an ADA disability does not mean that someone can't work.  Conditions like cancer, muscular dystrophy and multiple sclerosis should easily qualify and other conditions may also qualify, like orthopedic conditions that cause pain for which someone is prescribed opioids (emphasis added).[26]

139.    The CDC Guideline cautions that opioid prescriptions should typically not exceed a dosage of 50 MME nor a duration of 3 days without careful consideration by the prescribing doctor.  As these studies suggest, persons receiving prescriptions which exceed the higher end of the dosage

---

[24]    The Causes and Consequences of Opioid Use Among Older Americans: A Panel Survey Approach, pp. 1& 6-7.  https://mrdrc.isr.umich.edu/publications/papers/pdf/wp419.pdf

[25]    https://ideas.repec.org/a/spr/aphecp/v19y2021i3d10.1007_s40258-020-00622-4.html.

[26]    https://www.eeoc.gov/laws/guidance/how-health-care-providers-can-help-current-and-former-patients-who-have-used-opioids, Question 2, p. 3.

(90 MME) and duration (7 days) thresholds are highly likely to be disabled within the meaning of the ADA.

140.    Accordingly, the Walgreens and Costco Policies are facially discriminatory policies. The Policies treat persons with opioid prescriptions exceeding the CDC Guideline dose and duration thresholds differently from (i) people with opioid prescriptions below those thresholds and (ii) people without opioid prescriptions.  Due to the correlation between prescriptions exceeding the CDC Guideline dose and duration thresholds and disability, the Policies result in proxy discrimination, which is a form of facial discrimination.

141.    Even assuming not every person with an opioid prescriptions exceeding the CDC Guideline dose and duration thresholds is disabled within the meaning of the ADA, the use by Walgreens and Costco of the CDC Guideline dose and duration thresholds, or similar thresholds, in their Policies to differentiate among its prescription customers is, at best, facially neutral over-discrimination whereby Walgreens and Costco recognize that while their Policies will disproportionately affect disabled persons, they may also affect nondisabled persons.

## XII.

### THE WALGREENS AND COSTCO POLICIES
### TREAT DISABLED PERSONS DISPARATELY

142.    The test for disparate treatment is deliberate indifference, which requires knowledge that a harm to a federally protected right is substantially likely and a failure to act upon that the likelihood.  When Walgreens and Costco adopted the dosage and duration thresholds from the CDC Guideline as part of their respective Policies, they knew that:

- the Guideline was directed to clinicians and not pharmacists,
- the Guideline was never intended for the purpose for which they were using it,
- the Guideline was only a recommendation, and
- the Guideline's dosage and duration thresholds were meant for acute pain and people just starting opioid medication.

143.    Walgreens and Costco knew that applying these thresholds to persons presenting valid opioid prescriptions exceeding those thresholds and who were not starting opioid medication was an inappropriate application of the CDC Guideline and that it was substantially likely to impact disabled persons seeking to have those valid prescriptions filled.  They knew this from:

- public complaints by the AMA,
- the CDC's own warning that its Guideline should not be misapplied, and
- complaints from their respective customers.

144.    Nonetheless, neither Walgreens nor Costco took any action to prevent the misapplication of the Guideline to disabled persons by their Policies and their pharmacists.

## XIII.

## THE WALGREENS AND COSTCO POLICIES
## DISPARATELY IMPACT DISABLED PERSONS

145.    The Walgreens and Costco Policies also each disparately impact disabled persons.  The Walgreens and Costco Policies treat patients with valid opioid prescriptions exceeding the dosage and duration thresholds in the CDC Guideline differently from other patients seeking to fill prescriptions. Those with prescriptions exceeding the dosage and duration thresholds in the CDC Guideline are disabled within the meaning of the ADA and are substantially less likely to get their prescriptions filled as written than are those whose prescriptions for opioids do not exceed the dosage and duration thresholds in the CDC Guideline and those with non-opioid prescriptions.  In 2018, for example, there were 168,158,611 opioid prescriptions issued in the United States.  Of these, 59,492,722 were for more than 7 days.  Additionally, 12,597,565, or 7.5% of the total number of opioid prescriptions, exceeded 90 MME.[27]  In 2018, Walgreens had a market share of prescription drug revenue of 17.5% and Costco had a market share of 0.6%.[28]  While it is unclear how many prescriptions were for more than 7 days

---

[27]    https://www.cdc.gov/drugoverdose/pdf/pubs/2018-cdc-drug-surveillance-report.pdf, Table 1B.

[28]    https://www.drugchannels.net/2019/02/the-top-15-us-pharmacies-of-2018-m.html.

01034110-1

and exceeded 90 MME, it seems clear a substantial number of prescriptions written in 2018 were/would have been subjected to the dosage and duration thresholds in the Walgreens and Costco Policies and those prescriptions were written for people who disproportionately qualify as disabled within the meaning of the ADA.

## XIV.

## THE WALGREENS AND COSTCO POLICIES
## DENY MEANINGFUL ACCESS TO DISABLED PERSONS

146.    Plaintiff, and the National Class and California Subclass she seeks to represent, have been, and are being, denied meaningful access to their valid prescription opioid medication exceeding the dose and duration thresholds of the CDC Guideline.  They are unable to get their valid prescriptions filled in the same manner as are (i) people with opioid prescriptions that do not exceed the dose and duration thresholds of the CDC Guideline and (ii) people with non-opioid prescriptions.  Their access is not meaningful because unlike other customers attempting to fill prescriptions, they

- have to plan a schedule for attempting to fill their prescription several days beforehand,
- have to be prepared to spend hours traveling to multiple stores at various distances from their homes to fill their prescriptions,
- cannot use a drive through lane but must go inside the store,
- have to dress certain ways before going into the pharmacy,
- have to avoid paying in cash if possible,
- risk being put on a "blacklist,"
- expect they will be pressured or required to take a lower dose or fewer pills of their prescription medication than what is prescribed,
- expect they will have to wait hours before their prescriptions are filled and/or be required to come back at inconvenient times,
- expect they may be required to purchase additional medication to get their prescription filled, and
- expect they will be given multiple, inconsistent reasons at the different pharmacies for why their prescription cannot be filled, if they are given any reason at all.[29]

---

[29]    Cite to stories from chronic pain patients on websites?

01034110-1

## XV.

## WALGREENS AND COSTCO HAVE FAILED TO MAKE REASONABLE MODIFICATIONS TO THEIR RESPECTIVE POLICIES, PRACTICES OR PROCEDURES

147.    Plaintiff has complained to Walgreens pharmacists and corporate headquarters about her treatment under its Policy.   Plaintiff has complained to Costco pharmacists and pharmacy managers about her treatment under its Policy.   Upon information and belief, numerous Walgreens and Costco customers have also complained to Walgreens and Costco about their policies for opioid prescriptions exceeding the CDC Guideline dose and duration thresholds.   Public organizations, such as the AMA and the CDC itself, have publicly complained about the inappropriate incorporation of the CDC Guideline dose and duration thresholds into company policies.   Thus, Walgreens and Costco are aware of the need to modify their Policies without any request by Plaintiff.   In the alternative, requesting reasonable modification would be futile.

148.    Discrimination includes "failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities."  42 U.S.C. §12182(b)(2)(A).

149.    The Department of Justice has published a Technical Assistance Manual to address compliance with Title III of the ADA.  The Manual provides several illustrations of this requirement, including the following:

> ILLUSTRATION 3:  A retail store has a policy of not taking special orders for out-of-stock merchandise unless the customer appears personally to sign the order.  The store would be required to reasonably modify its procedures to allow the taking of special orders by phone from persons with disabilities who cannot visit the store.  If the store's concern is obtaining a guarantee of payment that a signed order would provide, the store could, for example, take orders by mail or take credit card orders by telephone from persons with disabilities.[30]

---

[30]  https://www.ada.gov/taman3.html, III-4.2100.

150.    The Technical Assistance Manual also provides that: "A public accommodation may not impose eligibility criteria that either screen out or tend to screen out persons with disabilities from fully and equally enjoying any goods, services, privileges, advantages, or accommodations offered to individuals without disabilities." It includes the following illustrations:

ILLUSTRATION 1:  A restaurant has an unofficial policy of seating individuals with visible disabilities in the least desirable parts of the restaurant.  This policy violates the ADA because it establishes an eligibility criterion that discriminates against individuals with certain disabilities and that is not necessary for the operation of the restaurant.  The restaurant may not justify its policy on the basis of the preferences of its other customers.

ILLUSTRATION 2:  A parking garage refuses to allow vans to park inside even though the garage has adequate roof clearance and space for vans.  Although the garage operator does not intend to discriminate against individuals with disabilities, the garage's policy unnecessarily tends to screen out people with certain mobility impairments who, in order to have enough space for mobility aids such as wheelchairs, use vans rather than cars.[31]

151.    The improper use of the dosage and duration thresholds in the CDC Guideline acts as de facto eligibility criteria that screens out or tends to screen out persons with disabilities from fully and equally enjoying any goods, services, privileges, advantages, or accommodations offered to individuals without disabilities.  Thus, Plaintiff and the putative National Class and California Sub Class do not have a similar or "like" experience as non-disabled persons presenting prescriptions for non-opioid medication or for opioid medication which does not exceed the dosage and duration thresholds in the CDC Guideline.

152.    Even if the Walgreens and Costco Policies at issue applied to non-disabled persons, a modification of the Policies would still be necessary.  The DOJ's Technical Assistance Manual illustration of the parking garage which does not allow vans even though the garage has adequate roof

---

[31]  https://www.ada.gov/taman3.html, III-4.1100.

clearance and space for vans makes this clear. In that illustration, the policy obviously applies to both disabled and non-disabled persons, yet modification is still necessary.

153.    The Walgreens and Costco Policies at issue, and the related procedures and training, should be modified as follows:

1. Provide annual training to all pharmacists and initial training for newly hired pharmacists on the appropriate and inappropriate use of the CDC Guideline on Prescribing Opioids with respect to filling opioid prescriptions, which training:

   a. Explains the purpose of the CDC Guideline;

   b. Explains the limitations of the CDC Guideline;

   c. Discusses potential misapplications of the CDC Guideline;

   d. Provides training on valid medical reasons why an opioid prescription exceeding the CDC Guideline dose and duration thresholds might be legitimate;

   e. Emphasizes that all legitimate prescriptions are to be filled as written, including opioid prescriptions exceeding the CDC Guideline dose and duration thresholds;

   f. Emphasizes that the filling of opioid prescriptions exceeding the CDC Guideline dose and duration thresholds as written is not discouraged merely because such prescriptions exceed the CDC Guideline dose and duration thresholds;

   g. Emphasizes that customers presenting opioid prescriptions exceeding the CDC Guideline dose and duration thresholds are to be treated with respect, courteously and as any other customer, not as drug addicts or abusers.

2. Instruct and require that the specific reason(s) for refusing to fill opioid prescriptions exceeding the CDC Guideline dose and duration thresholds as written must be clearly documented internally.

3. Instruct and require that all customers are entitled to and shall be informed of the specific reason(s) for refusing to fill any opioid prescriptions, especially those exceeding the CDC Guideline dose and duration thresholds, which can be remedied by the customer,

4. Instruct that the fact that an opioid prescription exceeds the CDC Guideline dose and duration thresholds is insufficient in and of itself to refuse to fill the prescription;

5. Instruct that no customer presenting an otherwise legitimate and proper prescription for opioids should be refused the medication for any arbitrary reason, any reason based on the personal bias of the pharmacist against opioids or opioid customers, or for any reason whose sole purpose is to discriminate against opioid customers or treat them differently than customers presenting prescriptions for medications other than opioids;

6. To the extent that Defendant has implemented a policy requiring the rejection, denial or delay in filing an otherwise legitimate and proper prescription for opioids based solely on the CDC Guidelines, the repeal of said policy and publication of its repeal to all company pharmacists;

7.  Provide clear criteria by which a physician may request exemption of specific patients; and

8.  Any other modification determined to be reasonable and necessary under the law.

## XVI.

## CAUSES OF ACTION

### COUNT I
### Violation of Americans with Disabilities Act
### (42 U.S.C. §12101 *et seq*)

154.    Plaintiff realleges and adopts all prior paragraphs as if fully set forth herein.

155.    Title III of the ADA provides that "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. §12182(a).

156.    Plaintiff is disabled and has physical or mental impairments that substantially limit one or more of her major life activities within the meaning of the ADA.

157.    The Members of the National Class and the California Subclass are also disabled within the meaning of the ADA.  Patients with valid opioid prescriptions exceeding the CDC Guideline dosage and duration thresholds are prescribed such medication because they suffer from conditions which render them disabled within the meaning of the ADA.  Such patients tend to be either High Impact chronic pain patients, defined as having pain that lasts 3 months or longer accompanied by at least one major activity restriction,[32] cancer patients, or patients receiving palliative care.

158.    Defendants own, lease and/or operate places of public accommodation within the meaning of the ADA.

---

[32]    https://www.nccih.nih.gov/research/research-results/prevalence-and-profile-of-high-impact-chronic-pain.

159.    By its clear text, Title III requires a public accommodation to provide individuals with disabilities more than simple physical access to the accommodation's facilities.  Congress recognized that "individuals with disabilities continually encounter various forms of discrimination" including not only barriers to physical access, but also other forms of exclusion and "relegation to lesser services, programs, activities, benefits, jobs, or other opportunities."  42 U.S.C. §12101(a)(5); *see also* H.R. Rep. No. 485, Pt. 2, 101st Cong., 2d Sess. 35-36 (1990) ("lack of physical access to facilities" was only one of several "major areas of discrimination that need to be addressed"); H.R. Rep. No. 485, Pt. 3, 101st Cong., 2d Sess. 54 (1990) ("It is not sufficient to only make facilities accessible and usable; this title prohibits, as well, discrimination in the provision of programs and activities conducted by the public accommodation.").

160.    For that reason, the Act applies not only to barriers to physical access to business locations, but also to any policy, practice, or procedure that operates to deprive or diminish disabled individuals from the full and equal enjoyment of the privileges and services offered by the public accommodation to the public at large.  42 U.S.C. §12182.  Thus, a public accommodation may not have a policy or procedure that excludes individuals with disabilities from services.  42 U.S.C. §12182(b)(1)(A)(i).

161.    The statute also defines "discrimination" as including:

> the imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability . . . from fully and equally enjoying any goods, services facilities, privileges, advantages, or accommodations, unless such criteria can be shown to be necessary for the provision of the goods, services, facilities, privileges, advantages, or accommodations being offered

42 U.S.C. §12182(b)(2)(A)(i).  This provision "makes it discriminatory to impose policies or criteria that, while not creating a direct bar to individuals with disabilities, indirectly prevent or limit their ability to participate." 28 C.F.R. Pt. 36, App. B, p. 641 (commentary to 28 C.F.R. 36.301).

162.    A public accommodation must also make reasonable modifications to a policy, practice or procedure that has the consequence of denying such individuals access to its services unless making a reasonable modification would fundamentally alter the nature of the services.    42 U.S.C. §12182(b)(2)(A)(ii).

163.    Because Defendants operate places of public accommodation, they may not discriminate against individuals with disabilities "in the full and equal enjoyment" of the goods, services, facilities, privileges, advantages, or accommodations" they offer.  This means, among other things, that Defendants generally may not impose or apply unnecessary "eligibility criteria that screen out or tend to screen out an individual with a disability" from filling valid prescriptions for necessary medication legally prescribed.  42 U.S.C. §12182(b)(2)(A)(i).  Defendants must make "reasonable modification in policies, practices, or procedures, when such modifications are necessary to afford such services [or] privileges . . . to individuals with disabilities" unless doing so would fundamentally alter the nature of the goods, services, facilities, privileges, advantages, or accommodations.  42 U.S.C. §12182(b)(2)(A)(ii).  Such a change in Defendants' policies as applied to Plaintiff and the Members of the National Class and California Subclass would not be a fundamental alteration.

164.    The Walgreens and Costco Policies each discriminate against Plaintiff, and the Members of the National Class and the California Subclass, on the basis of their disability and deprive them of the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of the places of public accommodation owned, leased and/or operated by Defendants.

165.    Under the Walgreens and Costco Opioid Dispensing Policies, persons with valid prescriptions which exceed the dosage and duration thresholds of the CDC Guideline are "profiled" and treated differently and do not have full and equal enjoyment of, or meaningful access to, the

Walgreens and Costco retail pharmacies as do other people seeking to fill prescriptions for medication, whether opioid or non-opioid.

166.    The Walgreens and Costco Policies are facially discriminatory policies.  The Policies treat persons with opioid prescriptions exceeding the CDC Guideline dose and duration thresholds differently from people with opioid prescriptions below those thresholds and people without opioid prescriptions.  Due to the correlation between prescriptions exceeding the CDC dose and duration thresholds and disability, the Policies result in proxy discrimination, which is a form of facial discrimination.  *See Davis v. Guam*, 932 F. 3d 822, 837 (9th Cir. 2019)(e.g., discriminating against individuals with gray hair is a proxy for age discrimination because the fit between age and gray hair is sufficiently close).  In the alternative, the Walgreens and Costco Opioid Dispensing Policies have a disparate impact on persons who are disabled within the meaning of the ADA.   The Walgreens and Costco Opioid Dispensing Policies are also not facially neutral because they draw a distinction based on a trait more likely to be applicable to disabled persons, i.e., disabled persons are more likely to require opioid prescriptions which exceed the dosage and duration thresholds of the CDC Guideline than non-disabled persons.

167.    In addition, the Walgreens and Costco Opioid Dispensing Policies treat individuals differently on the basis of seemingly neutral criteria that are so closely associated with disabled persons that discrimination on the basis of such criteria, i.e., the need for opioid prescriptions exceeding the CDC Guideline dosage and duration thresholds, is, constructively, facial discrimination (referred to as "proxy discrimination").

168.    Even assuming not every person with an opioid prescriptions exceeding the CDC Guideline dose and duration thresholds is disabled within the meaning of the ADA, the use by Walgreens and Costco in their Policies of the CDC Guideline dose and duration thresholds to

differentiate among its prescription customers is, at best, facially neutral over-discrimination whereby Walgreens and Costco recognize that while their Policies will disproportionately affect disabled persons, they may also affect nondisabled persons.

169.    Disability discrimination can be established through (1) disparate treatment, (2) disparate impact and/or (3) failure to make a reasonable modification of policies, practices or procedures.

170.    The test for disparate treatment is deliberate indifference, which requires knowledge that a harm to a federally protected right is substantially likely and a failure to act upon that the likelihood.  When Walgreens and Costco adopted the dosage and duration thresholds from the CDC Guideline as part of their respective Opioid Dispensing Policies, they knew that the Guideline was directed to clinicians and not pharmacists, that it was never intended for the purpose for which they were using it, that it was only a recommendation and that the dosage and duration thresholds were meant for acute pain and people just starting opioid medication.  Walgreens and Costco knew that applying these thresholds to persons presenting valid opioid prescriptions exceeding those thresholds and who were not starting opioid medication was an inappropriate application of the CDC Guideline and that it was substantially likely to impact disabled persons seeking to have those valid prescriptions filled.  Nonetheless, even after public complaints by the AMA, the CDC's own warning that its Guideline should not be misapplied and complaints from their respective customers, neither Walgreens nor Costco took any action to prevent their misapplication of the Guideline to disabled persons.

171.    The Walgreens and Costco Policies also each disparately impact disabled persons.  The Walgreens and Costco Policies each treat patients with valid opioid prescriptions exceeding the dosage and duration thresholds in the CDC Guideline differently from other patients seeking to fill prescriptions.  Those with prescriptions exceeding the dosage and duration thresholds in the CDC

Guideline are disabled within the meaning of the ADA and are substantially less likely to get their prescriptions filled as written than are (i) those whose prescriptions for opioids do not exceed the dosage and duration thresholds in the CDC Guideline and (ii) those with non-opioid prescriptions. While not providing information specific to the number of opioid prescriptions exceeding both the CDC dose and duration thresholds, the CDC has published information that in 2018, for example, there were 59,492,722 opioid prescriptions issued in the United States for more than 7 days and 12,597,565 opioid prescriptions, or 7.5% of the total number, exceeded 90 MME.[33]  In 2018, Walgreens had a market share of prescription drug revenue of 17.5% and Costco had a market share of 0.6%.[34]  Thus, a substantial number of prescriptions written in 2018 were/would have been subjected to the dosage and duration thresholds under the Walgreens and Costco Policies and those prescriptions were written for people who disproportionately qualify as disabled within the meaning of the ADA.

172.    Rather than focusing on whether there has been disparate treatment or disparate impact discrimination under the ADA (and also under the Rehabilitation Act), the U.S. Supreme Court and other Courts have asked whether disabled persons are denied meaningful access.  Here, Plaintiff, and the National Class and California Subclass she seeks to represent, have been, and are being, denied meaningful access to their valid prescription opioid medication which exceeds the dose and duration thresholds of the CDC Guideline.  They are unable to get their valid prescriptions filled in the same manner as are people with opioid prescriptions that do not exceed the dose and duration thresholds of the CDC Guideline and people with non-opioid prescriptions.  Their access is not meaningful because the Walgreens and Costco Policies, along with the training and implementing procedures and

---

[33]   https://www.cdc.gov/drugoverdose/pdf/pubs/2018-cdc-drug-surveillance-report.pdf, Table 1B.
[34]   https://www.drugchannels.net/2019/02/the-top-15-us-pharmacies-of-2018-m.html.

01034110-1

practices, expressly and implicitly, incentivize the Walgreens and Costco pharmacists to not fill prescriptions exceeding the CDC Guideline dosage and duration thresholds as those prescriptions are written.

173.    Walgreens and Costco are each required to reasonably modify their respective Opioid Dispensing Policies, and their practices and procedures implementing those policies, necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, such as Plaintiff and the putative National Class and California Subclass. The improper use of the dosage and duration thresholds in the CDC Guideline acts as de facto eligibility criteria that screen out or tend to screen out persons with disabilities from fully and equally enjoying any goods, services, privileges, advantages, or accommodations offered to individuals without disabilities. Thus, Plaintiff and the putative National Class and California Sub Class do not have a similar or "like" experience as non-disabled persons presenting prescriptions for non-opioid medication or opioid medication which does not exceed the dosage and/or duration thresholds in the CDC Guideline.

174.    Walgreens and Costco are each aware of the need to modify their respective Opioid Dispensing Policies, and their practices and procedures implementing those policies without the need for a requested modification. The language of the CDC Guideline makes it obvious that the Guideline was not intended to be used as adopted by Walgreens and Costco. Even if not obvious, the Guideline has been publicly criticized by organizations, such as the AMA, and the CDC itself publicly warned against misapplication of its Guideline. In addition, Plaintiff has specifically complained to Walgreens' corporate headquarters, to Walgreens pharmacy managers and to Costco pharmacy managers about their respective Opioid Dispensing Policies, Practices and Procedures. Upon information and belief, numerous other disabled persons and their treating physicians have also complained to Walgreens and Costco about their respective Opioid Dispensing Policies, Practices and

Procedures and requested reasonable modification of the same.    In the alternative, requesting reasonable modification would be futile.

175.    Without intending to limit the relief to which she is entitled, Plaintiff seeks a modification to the Walgreens and Costco Opioid Dispensing Policies, Practices and Procedures so that valid opioid prescriptions for legitimate medical treatment exceeding the dosage and duration thresholds in the CDC Guideline will be filled as written.

176.    Defendants' conduct is ongoing and continuous, and Plaintiff, and the Members of the National Class and the California Subclass, have been harmed and continue to be harmed by Defendants' conduct.  Unless Defendants are restrained from continuing their ongoing and continuous course of conduct, Defendants will continue to violate the ADA and will continue to inflict injury upon Plaintiff and the Members of the National Class and the California Subclass.

177.    Plaintiff, and the Members of the National Class and the California Subclass, are entitled to injunctive relief and reasonable attorney's fees and costs from Defendants for their violation of the ADA.  Specifically, Plaintiff and the Members of the National Class and the California Subclass request this Court:

    a.  Enjoin Defendants from refusing to dispense opioid medication as prescribed when presented with valid opioid prescriptions for legitimate medical treatment;

    b.  Enjoin Defendants from making, and/or allowing to be made, the decision of whether an opioid prescription is medically necessary by someone other than a medical doctor licensed to practice medicine;

    c.  Order Defendants to revise their Opioid Dispensing Policies, Practices and Procedures, and train their employees, agents, representatives, contractors and staff on such policies, to not inappropriately use the CDC Guideline dosage and duration thresholds as a basis for refusing to fill valid opioid prescriptions as written or imposing some other requirement before the prescription is filled;

    d.  Order Defendants to revise their Opioid Dispensing Policies, Practices and Procedures, and train their employees, agents, representatives, contractors and staff on such policies, to require that patients be informed of the true reason why their opioid prescriptions are not

being filled, not being filled as written or some other requirement is being imposed before filling the prescription;

e. Order Defendants to produce and explain their use of all databases and data analytics employed in connection with patients presenting prescriptions for opioid medication which exceed the CDC Guideline dosage and duration thresholds;

f. Order Defendants to identify Members of the National Class and the California Subclass who have been blacklisted, flagged or otherwise included on a list or database as potentially abusing opioid medication;

g. Order Defendants to pay Plaintiff's and the Class' reasonable attorney's fees and costs; and/or

h. Order all other relief to which Plaintiff, and the Members of the National Class and the California Subclass, are justly entitled.

## COUNT II
### <u>Violation of Section 504 of the Rehabilitation Act of 1973</u>
**(29 U.S.C. §794)**

178.    Plaintiff realleges and adopts all prior paragraphs as if fully set forth herein.

179.    At all times relevant to this action, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794, was in full force and effect in the United States.

180.    The Rehabilitation Act forbids programs or activities receiving Federal financial assistance from, among other things, discriminating against otherwise qualified individuals with disabilities.

181.    Plaintiff is disabled and has physical or mental impairments that substantially limit one or more of her major life activities within the meaning of the Rehabilitation Act.

182.    The Members of the National Class and the California Subclass are also disabled within the meaning of the Rehabilitation Act.

183.    Upon information and belief, Defendants receive Federal financial assistance from the United States Department of Health and Human Services, including Medicare provider payments from the centers for Medicare/Medicaid Services under Title XVIII, Part D of the Social Security Act, 42

U.S.C. §1395 *et seq.* In addition, Costco provides a Mortgage Program for Costco Members[35], which mortgages receive, upon information and belief, Federal financial assistance through various Governmental entities.

184.    For the same reasons alleged in Count I, Defendants, through their discriminatory practices towards the Plaintiff and the Members of the National Class and the California Subclass, based upon their disabilities and solely by reason of their disabilities, have violated and continue to violate the Rehabilitation Act by, *inter alia*, denying disabled individuals, including Plaintiff and the Members of the National Class and the California Subclass, the full and equal goods, services, facilities, privileges, advantages or accommodations of their retail pharmacies throughout the United States.

185.    Defendants' conduct has harmed Plaintiff and the Members of the National Class and the California Subclass and will continue to harm Plaintiff and the Members of the National Class and the California Subclass.    Unless Defendants are restrained from continuing their ongoing and continuous course of conduct, Defendants will continue to violate the Rehabilitation Act and will continue to inflict injury upon Plaintiff and the Members of the National Class and the California Subclass.  Plaintiff, and the Members of the National Class and the California Subclass, are entitled to injunctive relief and reasonable attorney's fees and costs from Defendants for their violation of Section 504 of the Rehabilitation Act.  Plaintiff and the Members of the National Class and the California Subclass request this Court:

   a. Enjoin Defendants from refusing to dispense opioid medication as prescribed when presented with valid opioid prescriptions for legitimate medical treatment;

---

[35]   https://www.costco.com/mortgage-services.html.

01034110-1

b. Enjoin Defendants from making, and/or allowing to be made, the decision of whether an opioid prescription is medically necessary by someone other than a medical doctor licensed to practice medicine;

c. Order Defendants to revise their Opioid Dispensing Policies, Practices and Procedures, and train their employees, agents, representatives, contractors and staff on such policies, to not inappropriately use the CDC Guideline dosage and duration thresholds as a basis for refusing to fill valid opioid prescriptions as written or imposing some other requirement before the prescription is filled;

d. Order Defendants to revise their Opioid Dispensing Policies, Practices and Procedures, and train their employees, agents, representatives, contractors and staff on such policies, to require that patients be informed of the true reason why their opioid prescriptions are not being filled, not being filled as written or some other requirement is being imposed before filling the prescription;

e. Order Defendants to produce and explain their use of all databases and data analytics employed in connection with patients presenting prescriptions for opioid medication which exceed the CDC Guideline dosage and duration thresholds;

f. Order Defendants to identify Members of the National Class and the California Subclass who have been blacklisted, flagged or otherwise included on a list or database as potentially abusing opioid medication;

g. Order Defendants to pay Plaintiff's and the Class' reasonable attorney's fees and costs; and/or

h. Order all other relief to which Plaintiff, and the Members of the National Class and the California Subclass, are justly entitled.

186.     In addition to injunctive relief, Defendants' conduct has caused damages to Plaintiff and the Members of the National Class and the California Subclass, which they are entitled to recover.

## COUNT III
### Violation of the Anti-Discrimination
### **Provisions of the Affordable Care Act**
### (42 U.S.C. §18116)

187.     Plaintiff realleges and adopts all prior paragraphs as if fully set forth herein.

188.     Section 1557 of the Patient Protection and Affordable Care Act ("ACA") (codified at 42 U.S.C. §18116) was established to combat healthcare discrimination by any health program, healthcare entity, or activity that receives federal funding. This Act of Congress makes it illegal to

discriminate against individuals based upon their race, national origin, gender, age, or disability. Section 1557 of the ACA protects individuals from discrimination in any health program or activity of a recipient of federal financial assistance, such as hospitals, clinics, employers, retail community pharmacies or insurance companies that receive federal money. Section 1557 specifically extends its discrimination prohibition to entities that receive federal financial assistance in the form of contracts of insurance, credits, or subsidies, as well as any program or activity administered by an executive agency, including federal health programs like Medicare, Medicaid, and CHiP.

189.    42 U.S.C. §18116, ACA §1557, provides in pertinent part as follows:

(a) . . . an individual shall not, on the ground prohibited under… section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794), be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments). The enforcement mechanisms provided for and available under such title VI, title IX, section 504, or such Age Discrimination Act shall apply for purposes of violations of this subsection.
ACA § 1557, 42 U.S.C. §18116(a)

190.    Under 42 U.S.C. §1396r–8(k)(10), "Retail Community Pharmacy" means an independent pharmacy, a chain pharmacy, a supermarket pharmacy, or a mass merchandiser pharmacy that is licensed as a pharmacy by the State and that dispenses medications to the general public at retail prices.

191.    Recipients of Federal financial assistance, such as Defendants, are prohibited from providing "any service, financial aid, or other benefit to an individual which is different, or is provided in a different manner, from that provided to others under the program." *See* 45 C.F.R. §80.3(a)(ii). Federal financial assistance has been interpreted and enforced to cover a broad range of programs receiving federal funds.

192.     Defendants are subject to §1557 due to the fact that, upon information and belief, they receive Federal financial assistance from the United States Department of Health and Human Services, including Medicare provider payments from the centers for Medicare/Medicaid Services under Title XVIII, Part D of the Social Security Act, 42 U.S.C. §1395 *et seq*.  In addition, Costco provides a Mortgage Program for Costco Members[36], which mortgages receive Federal financial assistance through various Governmental entities.

193.     Defendants meet the qualifications for being a "health program or activity, any part of which is receiving Federal financial assistance" under §1557(a).

194.     Furthermore, Walgreens represents that it is subject to §1557 of the ACA, and under that law:

> Walgreens complies with applicable civil rights laws and does not discriminate, exclude people or treat them differently on the basis of race, color, national origin, age, sex, **disability** or any other legally protected characteristic.[37]

195.     Plaintiff and the Members of the National Class and the California Subclass are disabled under both the ADA and §504 of the Rehabilitation Act.

196.     For the same reasons alleged in Count I and II, the discriminatory actions of the Defendants alleged herein were undertaken on the basis of and solely by reason of Plaintiff's disabilities and the disabilities of the Members of the National Class and the California Subclass.  In addition, due to Defendants' acts of discrimination, Plaintiff and the Members of the National Class and the California Subclass have not been provided meaningful access to their life-sustaining medications.

---

[36]  https://www.costco.com/mortgage-services.html.
[37]  *See* https://www.walgreens.com/topic/information/access-to-services.jsp (emphasis added).

01034110-1

197.    Defendants' actions have violated and continue to violate §1557(a) of the Affordable Care Act by intentionally causing Plaintiff and the Members of the National Class and the California Subclass to "be excluded from participation in, be denied the benefits or, or be subjected to discrimination under any health program or activity, any part of which is receiving Federal financial assistance" based on disability which is a prohibited ground of discrimination under Title IX.

198.    Plaintiff and the Members of the National Class and the California Subclass have suffered damages by this violation of §1557(a) in the denial of access to necessary medical care and/or services including, though not limited to, the filing and receipt of their valid opioid prescription medication.

199.    Plaintiff and the Members of the National Class and the California Subclass request Declaratory and injunctive relief as set forth in Counts I and II herein to protect their rights under §1557(a), and to remedy the Defendants' continued violation of §1557(a).

200.    Plaintiff and the Members of the National Class and the California Subclass have been harmed as a result of Defendants' conduct and are entitled to compensatory damages, injunctive relief, attorneys' fees and costs, and all other additional appropriate relief as may be available under this cause of action and the applicable law.

### COUNT IV
### Violation of Unruh Civil Rights Act
### (Cal. Civ. Code §51, *et seq.*)

201.    Plaintiff realleges and adopts all prior paragraphs as if fully set forth herein.  This claim is also brought on behalf of the Members of the California Subclass.

202.    The Unruh Civil Rights Act, California Civil Code §51(b), provides: "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, or sexual

orientation are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Additionally, pursuant to §51(f) of the Unruh Civil Rights Act, "a violation of the right of any individual under the federal Americans with Disabilities Act...shall also constitute a violation the Act."

203.    Defendants' discriminatory conduct alleged herein includes, *inter alia*, the violation of the rights of persons with disabilities set forth in Title III of the ADA and therefore also violates the Unruh Act. Cal. Civ. Code §51(f).

204.    As described above, the discriminatory acts of Defendants, in their refusal to fill valid opioid prescriptions and/or refusing to apply bargained for savings for previously covered medications, have denied Mrs. Smith and the Members of the California Subclass access and service to the medications to which they are entitled.

205.    Defendants' conduct violates the Unruh Act because their policies and practices deny Plaintiff and the Members of the California Subclass the full and equal accommodations, advantages, facilities, privileges, and services of Defendants' business establishment on the basis of their disabilities.

206.    Defendants operate business establishments within the jurisdiction of the State of California and are obligated to comply with the provisions of the Unruh Civil Rights Act.

207.    Pursuant to §51(a) of the Unruh Civil Rights Act, anyone who denies, aids or incites a denial, or makes any discrimination or distinction contrary to the Unruh Act, Civil Code §51, is liable for each and every offense for the actual damages, and any amount that may be determined by a jury, or a court sitting without a jury, up to a maximum of three times the amount of actual damage but in no case less than four thousand dollars ($4,000), and any attorney's fees that may be determined by the court in addition thereto.

01034110-1

208.    Additionally, Plaintiff and the Members of the California Subclass are entitled to injunctive relief to remedy Defendants' discrimination, as well as damages for past harm, attorney's fees, and costs, and all other additional appropriate relief as may be available under this cause of action and the applicable law.

## XII.

## JURY DEMAND

209.    Plaintiff and the Members of the National Class and the California Subclass request a jury trial on all issues triable by a jury.

## XIII.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of herself and the Members of the National Class and the California Subclass, prays for:

1.    An Order certifying the Class proposed by Plaintiff, naming Plaintiff as Class representative of the National Class and the California Subclass, and appointing her counsel as Class counsel of the National Class and the California Subclass;

2.    A declaratory judgment that Defendants are in violation of the ADA, the ACA, the Rehabilitation Act of 1973 and the Unruh Civil Rights Act along with an award of fees, costs, attorney's fees, and any and all other damages permitted by law under these Acts;

3.    Injunctive relief as prayed for herein;

4.    An award of compensatory damages to Plaintiff and the Members of the National Class and the California Subclass in an amount determined by the jury that would fully compensate them for the injuries by Defendants' discriminatory conduct;

5.    An award of punitive damages to Plaintiff and the Members of the National Class and the California Subclass in an amount determined by the jury, but no less than three times the amount of actual damages, that would punish Defendants for the intentional, willful, wanton, and reckless discriminatory behavior;

6.    Statutory damages against Defendants for each violation of the Unruh Act;

7.    Payment of costs of suit;

8.    Payment of reasonable attorneys' fees; and,

01034110-1

9.  All other relief to which Plaintiff, and the Members of the National Class and the California Subclass are justly entitled as a matter of law or equity.

Dated:        November 12, 2021            Respectfully submitted,

                                           LAW OFFICE OF THOMAS D. HAKLAR


                                           By:/s/ Thomas D. Haklar
                                               Thomas D. Haklar
                                               State Bar No. 169039
                                               320 Encinitas Blvd.., Suite A
                                               Encinitas, CA 92024
                                               Tel.: (858) 481-5454
                                               Fax: (858) 720-9797
                                               thaklar@haklarlaw.com

01034110-1